**WISCONSIN PACKING CO., INC.,
Plaintiff-Appellant,**

v.

**INDIANA REFRIGERATOR LINES,
INC., Defendant-Appellee.**

**No. 78–2305.**

United States Court of Appeals,
Seventh Circuit.

Rehearing En Banc Dec. 3, 1979.

Decided March 18, 1980.

---

John P. Brady, Milwaukee, Wis., for plaintiff-appellant.

H. Barney Firestone, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER, TONE, BAUER, WOOD and CUDAHY, Circuit Judges.

CUMMINGS, Circuit Judge.

This is the second time this case has been before this Court. In August 1979, a divided panel of this Court upheld the district court's summary judgment for defendant. 604 F.2d 1022. On November 1, 1979, we granted plaintiff's petition for rehearing *en banc* and the case was subsequently reargued before all active judges. We now vacate the district court's judgment and remand the cause for trial.

In this action under the Carmack Amendment to the Interstate Commerce Act (49 U.S.C. § 20(11)), plaintiff seeks $13,092.66 in damages arising from the U.S. Navy's rejection of approximately 33,465 pounds of frozen meat shipped by plaintiff via defendant carrier from Milwaukee, Wisconsin, to the Naval Supply Center in Norfolk, Virginia. With the allegations in plaintiff's affidavits taken as true for purposes of reviewing defendant's summary judgment motion,[1] the record in this case discloses the following: On July 29, 1974, plaintiff shipper transferred the goods to defendant for delivery at Norfolk on July 31. The plaintiff had previously had the meat tested for compliance with Navy temperature regulations and had specified that the carrier was to maintain the meat en route in a refrigerated trailer at zero degrees Fahrenheit (Plaintiff's Supp. App. 18). When the goods arrived at Norfolk on the appointed day, the Naval Supply Center refused delivery because the cargo temperature was 1.2 degrees over tolerances (Plaintiff's Supp. App. 19). Defendant immediately notified plaintiff of the rejection and subsequently brought the shipment back to Milwaukee, stopping in Pittsburgh so that the refrigeration unit on the trailer could be tested.

---

1. Summary judgment should not be granted where, as here, material facts are disputed. The district court and the dissent have accepted the defendant's version of the facts, but this opinion follows the rule that the facts must be viewed in favor of the plaintiff as the party opposing summary judgment. 6 Moore's Federal Practice (2d ed. 1976) ¶ 56.15[3] and the myriad of cases cited.

Defendant carrier retained exclusive possession of the meat during this period. Thus one of its representatives was present when the seals were broken and the trailer opened in Norfolk and he observed the tests that indicated the meat was not within acceptable military standards. A carrier representative was also present when the meat was returned to the shipper's Wisconsin premises on August 2. He remained there while the meat was again tested and found to be 1.2 degrees over the required tolerances. Recognizing that the temperature of the meat represented a fatal deviation from the shipper's specifications, the carrier's agent chose not to investigate any further the circumstances surrounding the damage to the cargo. The shipper then refused the carrier's tender of the returned meat, and the carrier removed the trailer and its cargo from plaintiff's premises with the intention of attempting to resell the meat. Carrier representatives also rechecked the refrigeration unit on the trailer and continued to perform tests on the unit for three days. On August 5, the carrier's Milwaukee terminal manager advised the shipper he had been unable to dispose of the meat and the shipper agreed to take back the meat to dispose of on the carrier's behalf. Thereafter plaintiff kept the meat in cold storage, eventually selling it at a loss in two separate lots on September 30, 1974, and April 3, 1975, respectively.

During the August 2 examination of the trailer in Milwaukee, Karl Brown, one of plaintiff's local officers, orally informed James Stevenson, defendant's Milwaukee terminal manager, that the shipper would look to the carrier for reimbursement for the damage to the meat. Stevenson thereupon told Brown to prepare a letter "summarizing the situation." Accordingly, at the same meeting Brown handed Stevenson the following notice:

> "Wisconsin Packing Company refused to accept meat on trailer no. 4013 because of Army [Navy] rejection of temperatures averaging 1.2 degrees over acceptable allowance temperatures. Return temperatures checked out and ranged from nine to twenty-five degrees."

Stevenson accepted this letter which he apparently forwarded to defendant's headquarters in Muncie, Indiana, without comment. Neither he nor any other carrier representative ever sought additional information from plaintiff about the damage. The record also indicates that on April 10, 1975, shortly after the second lot of damaged meat was sold, Brown prepared on a formal claim notice an itemized list of plaintiff's losses (Attachment to Record Items 4 and 5). It was stipulated below, however, that plaintiff and defendant exchanged no written notice other than the August 2 letter during the nine-month period after the refusal of the meat by the Navy.[2]

Defendant's refusal to honor plaintiff's claim for its losses from the Navy's rejection of the meat led plaintiff to file this action in the district court. Defendant moved for summary judgment, arguing that plaintiff had failed to file a written claim for damage within nine months, as required by the standard bill of lading. Finding that a notice of loss is not equivalent to a claim for damage, the district court held that the August 2 letter was insufficient to meet the writing requirement of the bill of lading. The court also concluded "as a matter of law" that defendant lacked the actual knowledge of loss a written notice would have provided and that absent some further writing, plaintiff

---

**2.** The itemized claim notice contains several errors including the date "4/10/74" instead of "4/10/75" and a reference to a bill of lading dated August 12, 1974. That it refers to the goods at issue here is certain, for it properly identifies the parties, place of origin, and destination, lists the paid freight bill number, refers accurately to the quantity of meat contained in the two lots resold and establishes for the resale lots the correct circumstances of the loss.

This claim form apparently was not delivered to the carrier immediately after it was drafted, but plaintiff was then confronted with an extended labor strike (Defendant's Supp. App. 28–30). Plaintiff filed a "supplemental claim" with defendant on May 30, 1975 (Defendant's Supp. App. 81–82, 107) which Judge Reynolds said he did not see (Defendant's Supp. App. 107). Nevertheless the two documents were probably one and the same.

could not recover from defendant. Accordingly, Judge Reynolds entered summary judgment for defendant.

Congress adopted the Carmack Amendment to prevent carriers from insulating themselves from damage actions filed by shippers. Consequently, the Amendment requires carriers to issue a receipt or bill of lading for property received for transportation and makes the carrier liable to the lawful owner of the bill of lading for any damage caused by the carrier. The Amendment also makes it unlawful for the carrier to provide "a shorter period for the filing of claims than nine months [formerly four months] and for the institution of suits than two years" from the date the carrier disallows the claim. 49 U.S.C. § 20(11). In the case at bar, the carrier's bill of lading provided this minimum period for filing claims and instituting suits, adding that "in case of failure to make delivery, then [a claim must be made] within nine months after a reasonable time for delivery has elapsed." The bill of lading also specified that the claim must be "in writing," although the Carmack Amendment neither requires written claims nor imposes any other restrictions on the form of notice.

The Supreme Court has indicated that a bill of lading requirement that claims be made "in writing" within a specified period of time will be enforced (*St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird*, 243 U.S. 592, 604–605, 37 S.Ct. 462, 467, 61 L.Ed. 917), but the Court has also expressed a willingness to construe such writings liberally. Thus in *Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948, the Court stated that a bill of lading requiring written claims for losses within four months after the delivery of the property was intended simply "to secure reasonable notice" and "to facilitate prompt investigation."

Accordingly, it held that a written notice that "sufficiently apprised the carrier of the character of the claim  *  *  * " was adequate. The Court noted that compliance with the written notice provision of a bill of lading "does not require documents in a particular form," and that "It is addressed to a practical exigency and it is to be construed in a practical way." 241 U.S. at 198, 36 S.Ct. at 545. Therefore it permitted the shipper in that case to recover even though its communications with the carrier consisted of a series of telegrams about the damage to the cargo, one of which stated a mere intention to file a claim at some later date.

The principle that emerges from *Blish* should dispose of this case. Although lacking in formality, plaintiff's August 2 letter gave defendant "reasonable notice." When "construed in a practical way," it clearly represented an attempt to formalize the claim inherent in plaintiff's refusal to take back the meat and its oral assertions that defendant was at fault. It thus sufficed to advise the carrier that the shipper was seeking reimbursement for the loss. It is incontrovertible that the notice identified the goods by reference and set forth a formal statement of the damage. It is also apparent that the carrier not only was aware of the need to investigate, but actually conducted a thorough inquiry. Moreover, since the carrier had itself spent three days unsuccessfully endeavoring to dispose of the meat, it knew at least as well as the shipper what the maximum loss could be. Thus within a few days of the damage defendant had all the information necessary to protect its interests in the face of plaintiff's claim. Accordingly, the August 2 letter was "an adequate statement  *  *  * deemed to satisfy this [written claim] requirement" of the bill of lading. 241 U.S. at 198, 36 S.Ct. at 545.[3]

---

**3.** In light of *Blish*, it is evident that the words "I claim" or the like need not appear in the communication in order to comply with the writing requirement of a bill of lading. We must therefore reject as overly formalistic the strict dichotomy between a "claim" for damage and a "notice" of damage adopted in *Atlantic Coast Line R. Co. v. Pioneer Products, Inc.*, 256 F.2d 431, 433 n. 3 (5th Cir. 1958). The relevant inquiry is rather whether the written communication alerts the carrier that reimbursement will be sought for the damage and does so in such a way as to permit the carrier to take the steps necessary to protect its interests. The

The carrier insists, however, that a prevailing Interstate Commerce Commission (ICC) regulation requires more formal notice than was available here. The section of the regulation relied on by the court below provides:

"Bad order reports, appraisal reports of damage, notations of shortage or damage, or both on freight bills, delivery receipts, or other documents, * * * shall, standing alone, not be considered by carriers as sufficient to comply with the minimum claim filing requirements [of this regulation]." 49 C.F.R. § 1005.2(c) reproduced in *Ex Parte No. 263*, 340 I.C.C. 515, 719 (1972).

That this provision is inapplicable to the case at bar becomes obvious when the regulation is viewed in its entirety. The central provision of the regulation states:

"*A claim* for * * * damage to * * cargo *shall not be voluntarily paid* by a carrier unless filed in writing * * * with the receiving or delivering carrier * * * within the specified time limits * * * required by law, [or by] the terms of the bill of lading * * *." 49 C.F.R. § 1005.2(a) reproduced in 340 I.C.C. at 718 (emphasis supplied).

The regulation also states that its provisions "shall govern the *processing* of claims for loss * * *." 49 C.F.R. 1005.1 reproduced in 340 I.C.C. at 718 (emphasis supplied). See also 340 I.C.C. at 553. Given the contrasting references in the accompanying legislative proposals to "disputed claims" and "claims determinations," see, *e. g.*, 340 I.C.C. at 587, 588, 595, 596, it is apparent that the purpose of the regulation was to make claim *settlement* more expeditious by providing procedures for the *voluntary* disposition of claims by carriers. The formalities the regulation mandates serve the purpose of preventing carriers from discriminating among shipper customers by settling spurious or frivolous claims of certain shippers while rejecting bona fide claims of others. See 340 I.C.C. at 524, 529, 530, 544, 547–548, 553, 605, 606.

Thus far from controlling the form a notice must take here, the regulation does not even apply to a contested case such as this. Instead of attempting to regulate the process of judicial determination of claims, the ICC indicated that its intention was to encourage parties to follow formal procedures that would make it unnecessary for them to face the unattractive prospect of time-consuming, expensive and potentially unavailing litigation in the district courts. 340 I.C.C. at 553, 570, 613. Indeed, by submitting various legislative proposals to increase its role in claims determination, the Commission expressed its doubts about its authority to erect substantive barriers to legal claims recovery. The regulation therefore presents no obstacle to plaintiff's case.

Even if the regulation were to apply, plaintiff could demonstrate its compliance. First, because careless wording in Section 1005.2(c) of the regulation renders precise interpretation impossible, it is not clear that the provision precludes a claim based on the notice available here. The sufficiency of the plaintiff's August 2 letter under the regulation gains force from the ICC's own recognition that, as here, a shipper often does not know the extent of the damage until long after delivery and must therefore have the opportunity to file a supplemental notice. 340 I.C.C. at 555. The ICC thus seems to have anticipated that an initial claim notice may provide no more than was available to defendant in this case.

In *Gay v. Graves Truck Line, Inc.*, 1 Kan.App.2d 704, 573 P.2d 632 (1977), the court held the regulation did not bar a consignee from recovering, although the only written communication between the

results of this inquiry will vary with the specific context and the investigation will require a court to look to several factors, including course of dealing and performance, that might be relevant for construing the intent of the parties. See *American Synthetic Rubber Corp. v. Louisville & Nashville R. Co.*, 422 F.2d 462, 468 (7th Cir. 1970). The presence or absence of certain objective considerations, including the detail in the notice and the actual knowledge available to the carrier, see discussion *infra*, will doubtless be highly significant in most cases.

parties during the nine-month period was an inspection report sent by the carrier to the consignee regarding the damage. The court noted that plaintiff filed a supplemental claim ten months later when the actual damages became precisely known. Similarly here, plaintiff supplemented its original letter with the formal claim dated April 10, 1975, a claim notice that unquestionably met the requirement of the regulation. This notice apprised the carrier of the actual losses shortly after they became known. The maximum sixty days between the time plaintiff learned of the actual damages and the receipt of that claim by the carrier (see note 2 *supra*) was only slightly longer than the comparable period in *Gay* and, more importantly, the actual time between the loss and full notice was about the same.[4] It is significant, moreover, that as noted the bill of lading here stated that the time for filing a claim would be nine months from the date of delivery but "in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed." The Navy's refusal of the meat might well be viewed as within the kind of "failure to make delivery" contemplated by that provision (compare *Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co.*, 241 U.S. at 196, 36 S.Ct. at 544) and the shipper's difficulty in finding a substitute market for the meat could affect the calculation of a "reasonable time" so as to make the delay here immaterial.

The case law does not demonstrate the insufficiency of the plaintiff's notice. In fact, a number of the cases cited by defendant support the proposition that the form of the written notice is less important than its adequacy in affording the carrier an opportunity to inspect the damaged goods. For example, in *Miller v. Aaacon Auto Transport, Inc.*, 447 F.Supp. 1201 (S.D.Fla.1978), the court held that informal letters from the shipper to the carrier were sufficient notice. It concluded:

> "The purpose of the written claim requirement is not to avoid the payment of just claims, but to facilitate prompt investigation of claims and insure equality of treatment among shippers.

> \*   \*   \*   \*   \*   \*

> "[T]he requirement is satisfied if the written instruments supply 'sufficient information upon which a prompt and complete investigation may be based.'" 447 F.Supp. at 1204 (citations omitted).

Accord, *American Synthetic Rubber Corp. v. Louisville & Nashville R. Co.*, 422 F.2d 462, 468–469 (6th Cir. 1970); *Loveless v. Universal Carloading & Distributing Co.*, 225 F.2d 637, 639 (10th Cir. 1955); *Thompson v. James G. McCarrick Co.*, 205 F.2d 897, 900, 901 (5th Cir. 1953); *Rollei of America, Inc. v. T.I.M.E.—DC, Inc.*, 140 N.J.Super. 560, 357 A.2d 33, 35 (1976); see also *Atchison, T. & S.F. Ry. Co. v. Littleton Leasing and Investment Co.*, 582 F.2d 1237, 1240 (10th Cir. 1978).

Perhaps for this reason courts have been more liberal in finding compliance with a claim procedure as the carrier's actual knowledge of the facts surrounding the claim increases. See *Conagra, Inc. v. Burlington Northern, Inc.*, 438 F.Supp. 1266, 1269 (D.Neb.1977).[5] Such an approach not only reflects a practical understanding of how a prudent carrier should and would construe a written notice when it is fully aware of the circumstances and extent of loss, but also comports with the equities of the situation. A carrier is surely less entitled to block recovery when its own acts or omissions have created a situation in which processing a claim is more difficult. Indeed, such considerations have given rise under other circumstances to an estoppel defense for shippers when carriers assert

---

4. The loss occurred on August 2, 1974, when plaintiff refused the meat. Under defendant's theory full notice was due May 2, and it was received May 30 according to the district judge (Defendant's Supp. App. 107).

5. See also *Littleton Leasing, supra,* in which the court acknowledged that compliance with the bill of lading provision has been found when "there were actual dealings with claim agents of the carrier aside from some type of written notice." 582 F.2d at 1241 (citing cases).

failure to comply with time limitations. *Perini-North River Assocs. v. Chesapeake & Ohio Ry. Co.*, 562 F.2d 269, 272 (3d Cir. 1977); [6] see also *Hopper Paper Co. v. Baltimore & O. R. Co.*, 178 F.2d 179 (7th Cir. 1949), certiorari denied, 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359.

If under the policies behind the notice requirement, actual knowledge or a full inquiry on the part of the carrier may buttress a shipper's claim when the written notice is informal or perhaps even nonexistent, the obverse is also true: the complete absence of such actual knowledge of the damage or its extent will vitiate a claim unless the writing gives a precise basis for investigation. Not surprisingly, then, the absence of any reason for the carrier to know of the damage or its extent has been a salient characteristic of many of the cases (including those cited by the defendant) in which claims have been denied. *East Texas Motor Freight Lines v. United States*, 239 F.2d 417 (5th Cir. 1956); *Northern Pacific Ry. Co. v. Mackie*, 195 F.2d 641 (9th Cir. 1952); *Delphi Frosted Foods Corp. v. Illinois Central R. Co.*, 188 F.2d 343 (6th Cir. 1951), certiorari denied, 342 U.S. 833, 72 S.Ct. 53, 96 L.Ed. 630; *Insurance Co. of North America v. Newtowne Mfg. Co.*, 187 F.2d 675 (1st Cir. 1951); *MGD Graphics Systems Americas Co. v. Acme Fast Freight, Inc.*, No. 76 C 1605 (N.D.Ill. decided by unreported opinion on May 16, 1977); *Henry Pratt Co. v. Stor Dor Freight Systems, Inc.*, 416 F.Supp. 714 (N.D.Ill.1975). Under these circumstances, the dissent's reliance on *Atchison, T. & S. F. Ry. Co. v. Littleton Leasing and Investment Co.*, 582 F.2d 1237 (10th Cir. 1978), is misplaced. First, although a majority of the Tenth Circuit panel held the shipper's notice in *Littleton Leasing* was deficient, it acknowledged the general principles we have set forward as applicable to such cases, stating

"Generally any written document, however informal, which indicates a claim for damages is asserted, and identifies the shipment, will be adequate. *Georgia, Florida & Alabama Ry. v. Blish Milling Co.*, 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948; *American Synthetic Rubber Corp. v. Louisville & N. R. R.*, 422 F.2d 462 (6th Cir.). In accordance with this liberal attitude, we have held the requirement of a claim in writing has been satisfied where the carrier had inspected the damaged property noting the apparent damage, had acknowledged in writing that damages were sustained by carelessness in transit, and had agreed that a formal claim could be filed when itemized damages were ascertained. *Loveless v. Universal Carloading & Distributing Co.*, 225 F.2d 637 (10th Cir.)." 582 F.2d at 1240.

Second, and more important, unlike the case at bar, *Littleton Leasing* involved a situation in which the notice involved was sketchy *and* the carrier lacked any independent means of gaining information about the damage. Indeed, the damage to the goods in that case was not discovered until after delivery. Thus the meager communications from the shipper in *Littleton Leasing* were insufficient to provide the carrier with the additional information it needed to protect its interests.

We are not postulating a general rule that some actual knowledge must exist for an informal notice to be effective any more than we wish to decide whether some writing is always required. We find only that the combination of actual and written notice in this case is sufficient. Accordingly we need not reconsider the specific holding of *Hopper Paper Co. v. Baltimore & O. R.*

---

**6.** *Perini* held that a carrier's conduct estopped it from raising the defense that a written claim had been filed later than the nine months specified in the bill of lading where, as here, the carrier had actual knowledge of the extent of the damage. The case answers the question expressly left open in *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983, "[w]hether under any circumstances the shipper may rely upon the [estoppel] doctrine in avoidance of the time limitation clause of the bill of lading." 283 U.S. at 222, 51 S.Ct. at 458. Absent some further word from the Supreme Court, the dissent's statement that the Supreme Court "now simply requires compliance with the minimum time limits of the Carmack Amendment" is erroneous. Moreover, defendant's conduct in this case would seem sufficient to invoke the doctrine of estoppel here.

*Co.*, 178 F.2d 179 (7th Cir. 1949), certiorari denied, 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359. Since there was more than mere actual notice in this case, to overrule *Hopper* would be inappropriate, particularly insofar as that case helps illuminate the role actual notice can play in an evaluation of the overall situation.[7]

To sum up, the bill of lading merely required written claim of damage without any further specificity (Defendant's Supp. App. 112). Since under the plaintiff's version of the facts the carrier received oral notice of the claim and had actual knowledge of the fact of the damage, the extent of the damage and the reasons for the rejection by both the consignee and the shipper, a more complete written notice than was contained in the August 2, 1974, letter was unnecessary. That notice was delivered to the carrier well within the nine months specified by the bill of lading. Allowing the shipper an opportunity to recover is consistent with the prevailing case law and does not run afoul of the ICC regulation which, with its concern about the improper preferences or discrimination that can occur in voluntary settlements, has no application to this case. Under these circumstances, summary judgment for the carrier gave it an improper windfall.

This conclusion does not mean that a notice such as the August 2 letter would be appropriate under other circumstances. Although the requirements of the standard bill of lading do not include the use of any particular words for claiming damage (see note 3 *supra*), it is ordinarily essential for the shipper to indicate to the carrier that it will be looked to for reimbursement. In this case, however, plaintiff has alleged de-

fendant's actual knowledge and an oral assertion of liability, and assuming the plaintiff can prove the facts supporting these allegations, these circumstances, along with the language of refusal in the August 2 letter, would warrant a finding that the shipper has fulfilled the notice requirement. Accordingly, the cause should be remanded for trial on this issue and the merits of the claim. Circuit Rule 18 shall apply.[8]

Judgment vacated; cause remanded for trial.

SPRECHER, Circuit Judge, with whom PELL, Circuit Judge, joins, dissenting.

I respectfully dissent and I would overrule the *Hopper Paper Co.* case.

I

At one time, common carriers reduced their exposure to liability in various ways, including a contractual requirement that claims for loss or damage be made in writing within an exceedingly short time, such as 36 hours or a few days. The Supreme Court upheld the validity of such contractual stipulations "where reasonable in their terms." See *St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird*, 243 U.S. 592, 606, 37 S.Ct. 462, 468, 61 L.Ed. 917 (1917), holding 36 hours to be reasonable. See also *Erie R. R. Co. v. Stone*, 244 U.S. 332, 334, 37 S.Ct. 633, 634, 61 L.Ed. 1173 (1917), holding five days to be reasonable and listing at page 336, 37 S.Ct. at page 635 numerous prior Supreme Court cases validating the "binding force of these contracts."

The third proviso of the second sentence of the Carmack Amendment to the Inter-

---

7. *Hopper* is not the derelict the dissent implies it is, *Hopper* was consistent with and cited *Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396 (2d Cir. 1927), certiorari denied, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432, and was discussed with approval in *Loveless v. Universal Carloading & Distributing Co., Inc.*, 225 F.2d 637 (10th Cir. 1955). *Hopper* was also followed in *Delaware, L. & W. R. Co. v. United States*, 123 F.Supp. 579 (S.D.N.Y.1954); *Stearns-Roger Corp. v. Norfolk & Western Ry. Co.*, 356 F.Supp. 1238 (N.D.Ill.1973); *MGD Graphics Systems Americas Co. v. Acme Fast*

*Freight, Inc.*, 437 F.Supp. 10 (N.D.Ill.1977). As the dissent notes, some of the cases citing *Hopper* have properly distinguished it, absent a situation in which the carrier had the kind of actual knowledge available in *Hopper*. It is worth noting that here defendant also had such knowledge.

8. The defendant's April 23, 1979, motion to strike additional authority filed April 18, 1979, is denied. Inadvertently the panel opinion did not dispose of this motion.

state Commerce Act, amended on March 4, 1915, 38 Stat. 1196, 49 U.S.C. § 20(11), (known as the Cummins Amendment), made it unlawful for a contractual stipulation to provide a shorter period than four months for the filing of claims. In 1930, this proviso was amended in order to extend the time for filing claims from at least four months to at least nine months. 46 Stat. 251. The third proviso at the time of the occurrences in this case read as follows:

> *Provided further,* That it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation, or otherwise a shorter period for the filing of claims than nine months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice . . .

49 U.S.C. § 20(11).

The Interstate Commerce Act was revised, codified, and enacted, without substantive change, as subtitle IV of title 49 of the United States Code on October 17, 1978, after the present occurrences. The new codification provides that an action taken under a law replaced by it shall be deemed to have been taken under the new codification. The new codification of the third proviso of the second sentence of the Carmack Amendment appears as 49 U.S.C. § 11707(e) and now reads as follows:

> A carrier may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section. The period for bringing a civil action is computed from the date that person receives written notice from the carrier that it has disallowed any part of the claim specified in the notice.

The statute does not require that a claim be in writing or that it be filed in at least nine months, but it permits the contracting parties, the shipper and carrier, to enter into a contract with such requirements. The shipment involved in the present case was delivered pursuant to a Uniform Bill of Lading, section 2(b) of which specifies:

> As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier . . . within nine months after delivery . . . Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid.

In interpreting bills of lading pursuant to the Carmack Amendment, the Supreme Court merely has continued its former established practice of upholding the validity of contractual stipulations in bills of lading, except that instead of requiring reasonableness it now simply requires compliance with the minimum time limits of the Carmack Amendment. In *Chesapeake & Ohio Ry. Co. v. Martin,* 283 U.S. 209, 222, 51 S.Ct. 453, 458, 75 L.Ed. 983 (1931), the Court said:

> But the *Blish Company* case [*Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co.,* 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948 (1916)] makes clear that the fact that delivery was made contrary to instructions, due to the misunderstanding or negligence of the carrier, cannot successfully be set up as an estoppel against the claim of a failure to comply with the requirement of the bill of lading here involved. To allow it would be to alter the terms of a contract, made in pursuance of the Interstate Commerce Act and having, in effect, the quality of a statute of limitation, and thus to open the door for evasions of the spirit and purpose of the act to prevent preferences and discrimination in respect of rates and service. Compare *A. J. Phillips Co. v. Grand Trunk Western Ry. Co.,* 236 U.S. 662, 667, 35 S.Ct. 444, 445, 59 L.Ed. 774.

## II

On July 29, 1974, the plaintiff shipped 582 boxes of frozen ground meat weighing 32,010 pounds by means of defendant's trailer-

tractor truck, for delivery to the United States Naval Supply Center at Norfolk, Virginia. The plaintiff loaded the truck itself, closed the truck door and affixed the required seals. The defendant provided the driver. The shipment was rejected by the consignee on arrival in Virginia on July 31, for the reason that the meat was found to be 1.2 degrees Fahrenheit over the acceptable tolerances set forth in the handbook of military regulations—namely 16.2 degrees.

The truck returned to plaintiff's facilities in Milwaukee on August 2, 1974, where representatives of both plaintiff and defendant inspected the contents. The plaintiff then delivered to the defendant the following letter:

Wisconsin Packing Company refuses to accept meat on trailer no. 4013 because of Army rejection of temperatures averaging 1.2 degrees over acceptable allowance temperatures. Return temperatures checked out and ranged from nine to twenty-five degrees.

However, that night the trailer remained at plaintiff's facilities and the next day plaintiff instructed the defendant to deliver the trailer to a cold-storage facility, where it was unloaded by plaintiff's representatives. The plaintiff sold the meat thereafter in two separate sales, the last occurring on April 3, 1975, within the nine month period, but did not advise the defendant. A written claim specifying the amount of the salvage and the net loss was received by the defendant in June, 1975, after the nine-month limitation. At no time within the nine-month period was the defendant advised at what price or for what amount the obviously saleable meat was sold.

On July 20, 1976, the plaintiff sued the defendant in the Circuit Court of Milwaukee County, Wisconsin, from where it was removed to the federal district court on August 23, 1976. The defendant moved for summary judgment and by agreement of counsel, the following stipulation of facts was presented to the district court:

(1) The shipment involved in the instant proceeding was governed by the terms and conditions of the Uniform Domestic Straight Bill of Lading . . . . .

(2) That the only written document relative to the shipment in question submitted by Plaintiff, Wisconsin Packing to Defendant, Indiana Refrigerator Lines within the required nine month time period was a letter dated August 2, 1974, addressed to Mr. James Stevenson and signed by Mr. Karl Brown . . . [which is quoted in full above].

(3) That relative to the shipment in question, Defendant had in its possession I.R.L. invoice No. 01647; I.R.L. memo No. 59557; I.R.L. delivery receipt No. 59515 . . . . .

The district court entered summary judgment for the defendant for failure of the plaintiff to file a written claim within nine months, noting that:

Absent some further confirmation in writing from the plaintiff that it intended to file a claim or, at a minimum, an itemization of loss from plaintiff, the defendant was not chargeable with knowing that the plaintiff had in fact suffered any loss for which it sought reimbursement.

The panel of this court affirmed the district court judgment, distinguishing this court's decision in *Hopper Paper Co. v. Baltimore & O. R. Co.*, 178 F.2d 179 (7th Cir. 1949), *cert. denied*, 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359 (1950). A dissent by Judge Cummings took a different view. See *Wisconsin Packing Co., Inc. v. Indiana Refrigerator Lines, Inc.*, 604 F.2d 1022, 1024 (7th Cir. 1979) (Cummings, J., dissenting). Insofar as the opinion may have disagreed with *Hopper*, it was circulated among all judges of the court in regular active service and a majority did not favor a rehearing in banc on that question. *Id.* at 1024 n.1.

Subsequently, when a petition for rehearing with a suggestion for rehearing in banc was filed by the plaintiff, a majority of judges in regular active service voted for a rehearing in banc.

### III

In the *Hopper Paper Co.* case, the plaintiff's property was negligently destroyed in a train wreck between two of the defendant's trains, the carrier notified plaintiff of the disaster and then sold the salvage without the plaintiff's knowledge and pocketed the proceeds. As one of our sister circuits observed, "[t]he court was obviously concerned with the equities of the situation . . . ." *Perini-North River Associates v. Chesapeake & Ohio Ry. Co.*, 562 F.2d 269, 273 (3d Cir. 1977).

In the present case, the truck was loaded, closed and sealed by the plaintiff; the contents were not destroyed nor even shown to have immediately been damaged, inasmuch as the Navy rejected them because of the temperature rather than the condition of the meat; although the plaintiff wrote a letter refusing to accept the meat, it was at all times in the control of the plaintiff; the next day plaintiff instructed the defendant to move the truck to cold-storage facilities where plaintiff unloaded the meat; and plaintiff eventually sold the meat and did not timely advise the defendant of the fact or amount of the sale. At no time within nine months did the defendant know or was it advised by the plaintiff as to the value of the meat, the saleability of it or the fact of a loss. In fact, in inflationary times there is no logical reason to assume that a later sale of the meat might not bring a greater amount than the original attempted sale to the Navy. Thus, within nine months the defendant was not given notice of, nor did it have actual knowledge of, any fact whatsoever which would lead it to believe that the defendant had indeed suffered a loss, or if so, the amount of that loss.

The *Hopper Paper Co.* case held that "failure to give notice of a claim for damages or loss in accordance with a stipulation in a contract for the shipment of goods is excused, or is inapplicable, where the carrier has or is chargeable with actual knowledge of all the conditions as to the damages that a written notice could give." 178 F.2d at 181. The present case is distinguishable from *Hopper* in that "all the conditions as

to the damages" were not within the carrier's actual knowledge. Beyond that, however, the *Hopper* statement, which is described as a "general rule," is clearly erroneous on its face and contrary to all relevant Supreme Court authority.

In the first place, *Hopper* relies principally upon *Georgia, Florida & Alabama Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948 (1916), for its substituting of actual knowledge for written notice. *Blish* did not deal at all with actual knowledge but instead held for the plaintiff on the clearly expressed ground that "it appears that notice of the claim was in fact given." *Id.* at 197–98, 36 S.Ct. at 544. The crucial writing was a telegram which said, "We will make claim against railroad for entire contents of car at invoice price." *Id.* at 193, 36 S.Ct. at 543. The invoice price of $1,109.89 was attached to the bill of lading and the ultimate verdict in favor of the shipper was for $1,084.50. The Supreme Court said:

> [The stipulation for a timely written notice] is a precaution of obvious wisdom, and in no respect repugnant to public policy, that the carrier by its contracts should require reasonable notice of all claims against it *even with respect to its own operations.* . . .

*Id.* at 196, 36 S.Ct. at 544 (emphasis added).

This is the very antithesis of actual knowledge. The Court is saying that even if the carrier had actual knowledge of "its own operations," which is true in most loss claims against carriers, such actual knowledge could not be substituted for "reasonable notice." The *Blish* Court emphasized that "[t]he stipulation required that the claim should be made in writing . . . ." *Id.* at 198, 36 S.Ct. at 545. Finally, in order to leave no doubt as to the validity and mandatory effect of the bill of lading contractual stipulation, the Court said:

> But the parties could not waive the terms of the contract under which the shipment was made pursuant to the Federal act; nor could the carrier by its conduct give the shipper the right to ignore these terms which were applicable to that con-

duct, and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed. . . . We are not concerned in the present case with any question save as to the applicability of the provision, and its validity, and as we find it to be both applicable and valid, effect must be given to it. *Id.* at 197, 36 S.Ct. at 544 [citations omitted].

The Supreme Court has found non-compliance with the written notice requirement where the actual knowledge of the carrier has been accomplished through the oral or verbal communications of the shipper. *St. Louis, Iron Mountain & Southern Ry. Co. v. Starbird,* 243 U.S. 592, 606, 37 S.Ct. 462, 468, 61 L.Ed. 917 (1917); *Baltimore & Ohio R. R. Co. v. Leach,* 249 U.S. 217, 218, 39 S.Ct. 254, 63 L.Ed. 570 (1919).

In *Southern Pacific Co. v. Stewart,* 248 U.S. 446, 450, 39 S.Ct. 139, 140, 63 L.Ed. 350 (1919), the Court found that "the circumstances relied upon by the shipper [that the carrier had full knowledge of the damage] are inadequate to show a waiver by the carrier of written notice as required by the contract." In *Gooch v. Oregon Short Line Railroad Co.,* 258 U.S. 22, 24, 42 S.Ct. 192, 193, 66 L.Ed. 443 (1922), the Court said:

Of course too, actual knowledge on the part of employees of the [railroad] company was not an excuse for omitting the notice in writing.

Recently both the Third and Tenth Circuits have reconfirmed this rule. In *Perini-North River Associates v. Chesapeake & Ohio Ry. Co.,* 562 F.2d 269, 273 (3d Cir. 1977), the Court said:

We do not question the accepted rule that actual knowledge on the part of the carrier cannot substitute for the written notice required by a bill of lading.

In *Atchison, Topeka & Santa Fe Ry. Co. v. Littleton Leasing Co.,* 582 F.2d 1237, 1240 (10th Cir. 1978), the Court said:

Even actual knowledge on the part of the carrier's employees would not dispense with the requirement of notice of claim in writing.

Thus, the "general rule" of *Hopper* is no rule at all and never has been. In fact, the determining factors for the result in *Hopper* were, as the *Perini* court indicated, "the equities of the situation" which caused this court to blur the distinction between estoppel and actual knowledge. *Perini,* 562 F.2d at 273. And, as the *Atchison* court observed, the *Hopper* court was influenced by the fact that "the carrier . . . had acknowledged in writing that damages were sustained by carelessness in transit," 582 F.2d at 1240, that is, the carrier's telegram in that case to the consignor that the damage had occurred due to a collision of two of its own trains.

In the second place, *Hopper* emphasized that "the statute . . . was not intended to operate as a statute of limitation." 178 F.2d at 181. Of course the statute was not, but the significant fact is that it permitted carriers to impose a statute of limitations. As noted above, the Supreme Court in the *Chesapeake & Ohio Ry. Co. v. Martin,* case stated that the bill of lading contract was "made in pursuance of the Interstate Commerce Act and [had], in effect, the quality of a statute of limitation . . . ." 283 U.S. at 222, 51 S.Ct. at 458.

In the third place, the *Hopper* case has not been accorded much respect by other federal courts. Virtually every citation of *Hopper* by other courts either criticizes it or holds it narrowly to its facts.[1]

1. *Insurance Co. of North America v. Newtowne Mfg. Co.,* 187 F.2d 675, 681 (1st Cir. 1951) ("*Hopper* . . . seems perhaps out of line with the other cases . . . ."); *Perini-North River Associates v. Chesapeake & O. R. Co.,* 562 F.2d 269, 273 (3d Cir. 1977) ("*Hopper* . . . was considered a maverick decision . . . .

Most courts criticized *Hopper* . . . and demoted it to the ranks of cases distinguishable on their facts."); *Delphi Frosted Foods Corp. v. Ill. Cen. R. Co.,* 188 F.2d 343, 345 (6th Cir. 1951) ("*Hopper* . . . is based upon the peculiar facts of the case."); *East Texas Motor Freight Lines v. U. S.,* 239 F.2d 417, 420 n.10

*Hopper* could be held narrowly to its facts and distinguished here but I would prefer to overrule it completely inasmuch as it is so directly contrary to all Supreme Court teaching.

I would affirm the lower court's judgment.

(5th Cir. 1956) ("The holding of *Hopper* has been questioned in several cases."); *Northern Pac. Ry. Co. v. Mackie*, 195 F.2d 641, 643 (9th Cir. 1952) (There were "unusual circumstances [in] that [*Hopper*] case . . . ."); *Atchison, T. & S. F. R. Co. v. Littleton*, 582 F.2d 1237, 1240 (10th Cir. 1978) (cites *Hopper* but does not follow it: "compliance with the written notice requirement of . . . the bill of lading is mandatory."); *Henry Pratt Co. v. Stor Dor Freight Systems*, 416 F.Supp. 714, 715 (N.D.Ill.1975) ("We do not believe that *Hopper* . . . should be extended beyond its own particular facts . . . ."); *Conagra, Inc. v. Burlington Northern, Inc.*, 438 F.Supp. 1266, 1270 (D.Neb.1977) ("The *Hopper* case has been widely criticized . . . . [A]n extension of *Hopper* would result in a dubious precedent.").