**UNION CARBIDE CORPORATION,**
Plaintiff,

v.

**CONSOLIDATED RAIL CORPORATION.**

No. 79 C 4269.

United States District Court,
N. D. Illinois, E. D.

June 30, 1981.

---

Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., Arsham & Keenan, White Plains, N. Y., for plaintiff.

J. Patrick Herald, Baker and McKenzie, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Union Carbide Corporation ("Union Carbide") sues Consolidated Rail Corporation ("Conrail") for its alleged breach of a bill of lading transportation contract. Conrail claims Union Carbide cannot recover because it failed to file a claim of damages against Conrail within the time period required by Section 2(b) of the bill of lading ("Section 2(b)"). Both parties have moved for summary judgment. For the reasons stated in this memorandum opinion and order Union Carbide's motion is granted and Conrail's is denied.

### Facts [1]

On July 16, 1976 Union Carbide delivered to Conrail a hopper carload of polystyrene plastics (the "shipment") for transportation from S. Bound Brook, New Jersey to consignee Sweetheart Plastics, Inc. ("Sweetheart") in Manchester, New Hampshire. Conrail agreed to transport the shipment pursuant to Bill of Lading No. 352388 (the "bill of lading"), Section 2(b) of which stated:

> As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property ... or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed ....

On July 22, 1976 Conrail advised Union Carbide that the shipment had been involved in a derailment. Union Carbide immediately dispatched a replacement shipment to Sweetheart. Within a few days, however, Conrail informed Union Carbide that the derailment was "not serious" and that the original shipment was back en route to Sweetheart. Believing both the

---

1. Union Carbide's initial memorandum in support of its motion included a detailed "Statement of Facts," supporting each factual statement by reference to an appropriate source: answers to interrogatories, responses to requests for admissions or affidavits. Except as noted below, Conrail has not disputed Union Carbide's statement. This opinion therefore follows the same uncontested version.

original and replacement shipments would be delivered to Sweetheart, Union Carbide billed Sweetheart for two shipments.

In fact Conrail's second message was entirely false, for the derailment had caused serious damage and the first shipment was never sent on to Sweetheart. Instead Conrail turned over what remained of the shipment after the derailment to a salvor, who in turn sold the shipment (originally worth some $56,000) for $11,824. Conrail did not inform Union Carbide of the sale in advance, nor did it advise Union Carbide of the non-delivery to Sweetheart.

Union Carbide began investigating the circumstances in late February 1977 when Sweetheart refused to make payment, maintaining that it had never received the original shipment. Union Carbide asked Eastern Regional Transportation in Bound Brook to obtain a Proof of Delivery, and when none was immediately forthcoming it made several subsequent requests. Finally on July 25, 1977, having concluded that Sweetheart must be right in claiming nondelivery, Union Carbide filed a written claim (the "claim") with Conrail for loss of the shipment.

On January 31, 1978 Conrail advised Union Carbide by letter that it rejected the claim as untimely because of the year's lapse between the July 1976 notice of derailment and the July 1977 filing of the claim. Conrail concluded that the nine months plus "reasonable time for delivery," as provided in Section 2(b), had expired. Conrail's January 31, 1978 letter for the first time informed Union Carbide of the sale of the derailed shipment and offered to tender to it the proceeds of that sale (those proceeds were later paid to Union Carbide).

On October 15, 1979 Union Carbide filed this action under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707. It seeks to recover the difference between the shipment's alleged value ($56,-376) and the proceeds of the salvage sale. Union Carbide filed its summary judgment motion June 2, 1980 and Conrail filed its cross-motion for summary judgment June 27, 1980. Those motions were fully briefed

on July 14, 1980 and July 24, 1980, respectively. On April 30, 1981 this action was transferred to the docket of this Court.

### Conrail's Section 2(b) Defense

Section 2(b) is copied from Section 2(b) of the Uniform Bill of Lading and tracks the language of the Carmack Amendment. That statute renders a carrier liable for any damage it causes to property it transports. In that respect the statute prohibits a carrier from providing "a shorter period for the filing of claims than nine months." Though the statute does not specify that such claims be in writing, regulations promulgated thereunder contain such a requirement. 49 C.F.R. § 1005 (1972).

There is no dispute that absent the controversy as to Union Carbide's claim, Conrail would be liable here. Conrail maintains that the language of Section 2(b) and decisions interpreting the Carmack Amendment bar recovery by Union Carbide. In support of its position Conrail cites a long line of decisions in which the nine-month requirement has been strictly enforced. *See, e. g., Gooch v. Oregon S.L.R. Co.,* 258 U.S. 22, 42 S.Ct. 192, 66 L.Ed. 443 (1922); *Atchison, Topeka and Santa Fe Ry. Co. v. Littleton Leasing and Investment Co., Inc.,* 582 F.2d 1237 (10th Cir. 1978).

Union Carbide makes two arguments in response:

1. In this Circuit "failure to give notice of a claim for damages or loss in accordance with [Section 2(b)] ... is excused, or is inapplicable, where the carrier has or is charged with actual knowledge of all the conditions as to the damages that a written notice could give ... [for] in such a situation a formal notice by plaintiff to the defendant could not have accomplished anything more." *Hopper Paper Co. v. Baltimore & Ohio R. Co.,* 178 F.2d 179, 181–82 (7th Cir. 1949), *cert. denied,* 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359 (1950). Union Carbide asserts that doctrine plainly applies here, for it is undisputed that Conrail possessed knowledge of all facts pertinent to Union Carbide's potential claim (as Union

Carbide itself did not) almost immediately after the derailment.

2. Conrail's post-derailment assurance to Union Carbide that the shipment was still en route to Sweetheart operates to estop Conrail from asserting its Section 2(b) defense. *Perini-North River Associates v. Chesapeake & Ohio Ry. Co.*, 562 F.2d 269 (3d Cir. 1977).

### 1. *The* Hopper *Rule*

Viewed alone, *Hopper* would plainly compel summary judgment in favor of Union Carbide. All the undisputed facts—particularly those as to Conrail's knowledge of the damage to the shipment—bring this case precisely within the exception to the nine-month requirement recognized in *Hopper*. *Hopper* is the prototype of the researcher's dream: the controlling precedent on all fours.

Conrail scarcely essays to distinguish *Hopper* on its facts. Instead it claims that (1) *Hopper* is contrary to the great weight of authority, including Supreme Court cases (like *Gooch*) in which the nine-month requirement has been strictly enforced, and (2) *Hopper* has not survived the decision of our own Court of Appeals in *Wisconsin Packing Co., Inc. v. Indiana Refrigerator Lines, Inc.*, 618 F.2d 441 (7th Cir. 1980), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980).

■ As for the first of those contentions, it is true that a number of courts have criticized *Hopper*, but a number have followed it as well. See cases cited in *Wisconsin Packing*, 618 F.2d at 448 n.7. For a District Judge in this Circuit, however, the answer is both short and simple. It is neither permissible nor seemly to engage in the weighing of other authority in the pres-

ence of a direct precedent from our Court of Appeals.[2]

Conrail's second contention—that *Hopper* is no longer viable after *Wisconsin Packing*—is equally untenable. At issue in *Wisconsin Packing* was whether a shipper's letter to a carrier, though it did not comply with the technical notice requirements of the bill of lading, constituted sufficient "notice of a claim" anyway in light of all the circumstances (including the carrier's own knowledge of the damages claimed). Our Court of Appeals, sitting en banc, held that it did and overruled the original panel's divided affirmance of the District Court's summary judgment for the carrier. *Hopper* was put squarely in issue by dissenting Judges Sprecher and Pell, who urged that it be overruled. Not only did the other seven members of the Court reject that proposition (618 F.2d at 447–48) but they went on to say that "*Hopper* is not the derelict the dissent implies it is" and to cite a number of cases in which *Hopper* had been followed. *Id.* at 448 n.7.

■ Again the duty of this Court is plain. *Hopper* must be viewed as good law in this Circuit and, as such, as authority this Court is bound to follow. Conrail's "actual knowledge of all the conditions as to the damages that a written notice could give"—to use the language of *Hopper* itself—is undisputed.[3] *Hopper* effectively excuses Union Carbide's otherwise untimely filing of its claim.

### 2. *Estoppel*

■ Even apart from *Hopper*, on the facts of this case Conrail must be estopped from asserting its Section 2(d) defense. Union Carbide's failure to file a timely claim is directly attributable to Conrail's own false and misleading representation

---

**2.** Conrail's citation of Supreme Court decisions, all antedating *Hopper*, is unpersuasive. None of those decisions dealt with the type of circumstances presented in *Hopper* (and here), nor did they contain language preventing later adoption by our Court of Appeals of its position in *Hopper*. Conrail places heavy reliance on the statement in *Gooch* that "actual knowledge on the part of employees of the company was not an excuse for omitting the notice in writing." 258 U.S. at 24, 42 S.Ct. at 193. But

the *Gooch* language appears to refer to the lack of actual knowledge involved in that case, rather than expressing a categorical principle. At best *Gooch* is ambiguous.

**3.** This action actually presents a much more compelling case than *Hopper*, for the carrier's knowledge here was not only actual and complete but was in fact far superior to the knowledge possessed by the shipper until many months after the accident.

that the derailed shipment was in fact en route to Sweetheart. Given that representation Union Carbide had no reason to believe it even possessed a claim until Sweetheart refused to pay for the original shipment. When that occurred Union Carbide promptly and conscientiously made efforts to discover what had happened to the shipment. It thus bears no blame for its failure to file a "timely" claim. On the other hand, Conrail not only made the initial misrepresentation[4] but perpetuated its effects by not telling Union Carbide of the real disposition of the shipment—the sale of the salvage.

It would be difficult to posit a stronger case for estopping a carrier from asserting a Section 2(b) defense. Again Conrail's citation to the line of authority enforcing the nine-month requirement strictly is unpersuasive. None of those cases dealt with circumstances remotely similar to those presented here. *Perini*, on the other hand, dealt with analogous facts and held the carrier estopped.

*Perini* is both well reasoned and persuasive here. There the Court of Appeals for the Third Circuit held that although the nine-month requirement was designed to "benefit the carrier by providing a reliable record of potential liabilities," it is quite another matter to apply that requirement to insulate a carrier from liability for its *own* misconduct. To have rejected estoppel in *Perini* would have been to reward the carrier's misrepresentation to the shipper.

Precisely the same situation exists for Conrail. This Court concurs in the *Perini* view that Section 2(b) should not be interpreted to permit that abuse. Nothing in the policy underlying strict enforcement of the nine-month requirement compels a different result.

### Conclusion

Two independent reasons compel summary judgment for Union Carbide. There is no genuine issue as to any material fact, and Union Carbide is entitled to a judgment for $44,552 (plus interest from the dates stated in the Complaint) as a matter of law.

---

**4.** Conrail argues that "[e]ven if this Court does adopt a *Hopper*- or *Perini*-type rationale ... clearly matters relating to 'misrepresentation' ... are issues of fact which cannot be appropriately addressed at the summary judgment stage of a proceeding." But it fails to offer a single piece of evidence refuting Union Carbide's characterization of the facts, including Conrail's misrepresentation. In contrast Union Carbide's version of the facts is well supported by appropriate documentation. See footnote 1 of this opinion.

Rule 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial.

Conrail's contention that material issues of fact remain unresolved cannot stand in the face of that mandate. Union Carbide's July 14, 1980 memorandum was devoted entirely to pointing out that in light of Union Carbide's properly supported factual assertions, Conrail could not simply rest on its conclusory allegations to create a "material issue of fact." Conrail submitted two later memoranda, neither of which even attempted to address that point.

Finally it may be noted that Union Carbide's version of the critical fact involved in this action—Conrail's alleged representation that the shipment was en route to Sweetheart after derailment—is supported not only by the affidavit of Rita Matts but by Union Carbide's billing Sweetheart for two shipments. That contemporaneous conduct is consistent only with a belief that the original shipment had resumed its transit to Sweetheart.