Dr. Martin TREPEL, Plaintiff–
Appellant–Cross–Appellee,

v.

ROADWAY EXPRESS, INC.
Defendant–Appellee/Cross–
Appellant.

Nos. 97–4152, 97–4162.

United States Court of Appeals,
Sixth Circuit.

Argued: Dec. 15, 1998

Decided and Filed: Oct. 15, 1999

P. David Palmiere (argued and briefed), McConnell & Palmiere, Bloomfield Hills, Michigan, for Plaintiff–Appellant/Cross–Appellee.

Barry L. Springel (argued and briefed), Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Defendant–Appellee/Cross–Appellant.

Before: RYAN, SUHRHEINRICH, and COLE, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which COLE, J., joined. SUHRHEINRICH, J. (pp. 719–22), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

RYAN, Circuit Judge.

Dr. Martin Trepel appeals from the $80,000 damages award when a jury found the defendant, Roadway Express, Inc., liable for damage caused during shipment to a very rare wood carving. Trepel raises three evidentiary issues, claiming that the district court's erroneous evidentiary rulings require a new trial on damages only.

Roadway cross-appeals, claiming it is not liable at all or, if it is, that its damages should be offset by Trepel's insurance coverage and/or the limited liability provision in Roadway's tariffs.

We find no merit in Roadway's claims of error on the cross-appeal; therefore, we affirm the district court's judgment in that regard. However, we do find merit in two of Trepel's three evidentiary challenges. Namely, we conclude that: (1) under Federal Rule of Evidence 703, the district court abused its discretion by precluding the plaintiff's experts from testifying about the basis for their opinions regarding the worth of the wood carving; and (2) the district court abused its discretion when admitting only a limited portion of Trepel's deposition testimony, without admitting enough of the surrounding testimony to put the admitted portion of the statement into context, as required by Federal Rule of Evidence 106 and Federal Rule of Civil Procedure 32(a)(4).

Accordingly, for the reasons set forth below, we will vacate the jury verdict and remand the case for a new trial on the damages issue only.

## I.

Trepel purchased a wood carving of a snake, called a Baga serpent, from Mourtala Diop, a New York artist, for $15,000. Trepel claims this price was significantly lower than the actual value of the carving because Diop was desperate for money. Diop took the carving, which was about seven feet long, to Transfers International Packing & Shipping, Inc. (TIPS) in New Jersey, and paid $150 to have it shipped to Trepel in Arizona. TIPS transported the package to Roadway, and prepared a delivery receipt, noting that the package was a 20–pound sculpture. Mario Castaneda, the owner of TIPS, testified that he does not often engage in domestic shipping, and he has only worked with Roadway once before. TIPS did not tell Roadway the value of the carving, and Roadway never asked for that information. Roadway transported the package to Arizona, and upon being notified of its arrival in Arizona, Trepel sent his housekeeper to retrieve it. She unwrapped the package at the defendant's business premises and discovered that the carving had been broken into three pieces. The housekeeper refused delivery. About two weeks later, on February 25, 1993, Trepel submitted a claim form to Roadway and was told that he need not do anything further to complete the claim. At the time, Trepel was unaware of the actual value of the carving.

The evidence at trial revealed that the serpent carving is an authentic carving from the Baga tribe in Africa, and was most likely used during the Baga tribe's rituals, which makes it even more valuable. One of the plaintiff's experts appraised the serpent at $2.2 million, stating that it was one of the best in the world.

Some of the experts testified that the best way to determine the value of a carving such as this one is to look at the selling price of comparable pieces. However, several of the best serpent carvings in the world are in private collections and have not been sold recently. Trepel discovered one woman, Shelley Dinhofer, who had a very valuable Baga serpent. She stated in a tape-recorded conversation with Trepel that she had been offered $2 and $2.5 million, respectively, for the serpent, and had turned down both offers. In response to Trepel's inquiry, she stated that she would sell it for $3 million if she were offered that much.

Roadway denied Trepel's claim, and so, almost two years after the carving was broken, Trepel sued: (1) his insurance company, with whom he later settled for an undisclosed amount; (2) TIPS, a claim that is still pending; and (3) Roadway. Trepel's claims against Roadway included theories of negligence and breach of contract. During the pretrial proceedings, the district court determined that the case is governed by the Carmack Amendment to the Interstate Commerce Act. *See* 49 U.S.C. § 14706. Section 14706 simply provides that carriers providing transportation are liable to the person entitled to recover under the receipt or bill of lading for actual loss or injury to the property.

The case was tried to a jury, which found that the defendant was liable for the damage to the carving and awarded Trepel $80,000. Being greatly dissatisfied with the amount of the verdict, Trepel moved for a new trial on the damages issue only; the defendant moved for a judgment as a matter of law, formerly a judgment notwithstanding the verdict. The court denied both motions, and this appeal followed.

## II.

Roadway raises three issues on appeal, all relating to the Carmack Amendment. All three of the issues were raised in the court below either in the defendant's two motions for summary judgment, or its motion for judgment as a matter of law. We will affirm the district court on all three issues.

## A.

█ The first question we must decide is whether 49 C.F.R. § 1005.2(b) precludes

recovery because the claim form Trepel submitted to Roadway did not contain a specified or determinable amount as required by the regulation. Section 1005.2(b) provides:

A written ... communication ... from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and: (1) Containing facts sufficient to identify the baggage or shipment ... of property, (2) asserting liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims....

In order to resolve this issue, a fuller development of the facts is necessary. After Trepel's housekeeper discovered that the carving was broken, Trepel filed a cargo loss and damage claim, revealing that Trepel or TIPS had never been given a bill of lading, only a delivery receipt. On the back of the claim form were various regulations regarding the Carmack Amendment, 49 U.S.C. § 14706, including 49 C.F.R. § 1005.2(b). In the place where Trepel was to specify the amount of the loss or damage, he inserted, "to be determined but not to exceed $150,000.00." In due course, Roadway moved for summary judgment, claiming that strict compliance with the claim filing requirement is necessary for the plaintiff's *prima facie* case. The court disagreed and held that Trepel had substantially complied with the requirement, under the law of this circuit.

Because this issue involves a question of law, we will conduct a *de novo* review. *See K & T Enter., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir.1996).

Defendant invites our attention to three cases it contends stand for the proposition that the plaintiff must strictly comply with all three requirements of the regulation. We disagree. First of all, in one case upon which Roadway relies, *Salzstein v. Bekins Van Lines, Inc.*, 993 F.2d 1187 (5th Cir.

1993), the court did not specifically state that it was using a strict compliance requirement; instead, it held that because the plaintiffs did not give an estimate of the amount of their damages at all, their claim was barred. *See id.* at 1190. Similarly, in *Nedlloyd Lines v. Harris Transport Co.*, 922 F.2d 905 (1st Cir.1991), the shipper's claim was barred because the shipper never stated a price at all. The court did not impose a strict compliance requirement as to the specificity of the amount listed; instead, it only required that some amount be listed. *See id.* at 908–09.

In the third case defendant cites—*Pathway Bellows, Inc. v. Blanchette*, 630 F.2d 900 (2d Cir.1980)—two elements were missing from the written claim: (1) an amount of the damages, and (2) an assertion that the carrier was liable. The plaintiff attempted to file a second claim letter with the missing information, but it was filed one day after the time limit for filing had expired. Because it was one day late, the court held that the claim was time barred. *Id.* at 905. *Blanchette* is the closest a court of appeals has come to stating a strict compliance test. However, in this case, it was the time limit for which strict compliance was required, not the specific elements of the claim.

On the other hand, two cases from sister circuits seem to require no more than substantial compliance with the regulation, rather than strict compliance. In *Wisconsin Packing Co. v. Indiana Refrigerator Lines, Inc.*, 618 F.2d 441 (7th Cir.1980), the court stated, in *dicta*, that had it found the regulations applicable, it would have found the plaintiff complied with the regulations because courts should be liberal in finding compliance. *See id.* at 445–46. The court also stated that actual knowledge of the damage, plus written notice of the claim, even if the written notice does not comply with the regulation, together can meet the requirements of the regulation. *See id.* at 446.

Finally, a Ninth Circuit case held that written claims are to be construed liberally and that the standard for determining the sufficiency of a claim is one of substantial performance. *See Insurance Co. of N. Am. v. G.I. Trucking Co.*, 1 F.3d 903, 906 (9th Cir.1993). The court stated that an estimate of the damage was enough, in part because the carrier had begun to investigate the claim. The court noted that "the purpose of the written claim requirement is not to permit the carrier to escape liability, but to insure that the carrier may make a prompt and thorough investigation of the claim." *Id.* at 907.

This court has never expressly ruled on the issue; however, we have stated that "ICC property loss regulations are very informal. A claim need only contain sufficient facts to identify the goods, assert liability, and ask for money damages." *Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538, 545 (6th Cir.1986).

■ It would appear that the purposes of the regulation requiring the filing of a written claim form—(1) identifying the lost or damaged baggage; (2) asserting liability for loss; and (3) requiring a "specified or determinable" amount of loss—are to provide the carrier with notice of the nature of the baggage or property that is lost or damaged, the fact that the claimant intends to hold the carrier responsible, and a reasonably accurate indication of the value of the claim. In many cases, the claimant may not know the specific value of the article or articles that are lost or damaged, and may require some time to obtain that information; indeed, it appears this is such a case. We agree with the view articulated by the Ninth Circuit, that the purpose of the claim regulation is not to permit the carrier to escape liability but to insure that the carrier has enough information to begin processing the claim. Roadway, the carrier in the case at hand, did begin investigating and processing the claim. It is clear it was on notice of the claim; therefore, we hold that Trepel substantially complied with 49 C.F.R. § 1005.2. We think the claim form Trepel filed complies with the principle laid down in *Ford Motor Co.*, 795 F.2d 538, which we read to establish informally, what today we declare explicitly: substantial compliance with section 1005.2 suffices.

**B.**

■ In its second assignment of error, Roadway argues that it is entitled to offset the amount Trepel recovered from his insurance company against the amount of damages awarded by the jury.

The record does not declare the amount of Trepel's insurance settlement because Trepel and the insurance company signed a confidentiality agreement. However, based on Trepel's policy limits, Roadway surmises that Trepel collected $373,000 from the insurance company. Roadway argues that the language of its bill of lading authorizes the setoff. Section 2.(c) of the bill of lading reads:

> Sec. 2.(c) Any carrier or party liable for loss of or damage to any of said property shall have the full benefit of any insurance that may have been effected, upon or on account of said property, *so far as this shall not avoid the policies or contracts of insurance*, PROVIDED, that the carrier receiving the benefit of such insurance will reimburse the claimant for the premium paid on the insurance policy or contract.

(Emphasis added.) Roadway argues that this provision authorizes the setoff.

Trepel responds with two arguments: First, he argues that the bill of lading does not apply to him, because he never received the bill of lading; the woodcarving was shipped with only a delivery receipt which does not contain the quoted clause. Second, Trepel argues that even if the tariff did apply, it specifically states that Roadway gets the benefit of insurance on the property only if doing so does "not avoid the policies or contracts of insurance." Trepel points out that his insurance policy has a provision that states:

Transfer of rights.

If we make a payment under this policy, we will assume any recovery rights a covered person has in connection with that loss, to the extent we have paid for the loss.

All of your rights of recovery will become our rights to the extent of any payment we make under this policy. A covered person will do everything necessary to secure such rights; and do nothing after a loss to prejudice such rights.

And,

We will not make any payments under this policy to the benefit of any carrier or other bailee of damaged property.

Trepel's insurer agreed to waive its subrogation rights.

The district court denied the setoff, holding that the insurance provision trumps the language of the bill of lading, and that the insurer's agreement to waive its subrogation rights should not change the result. Roadway disagrees and assigns error. Because this issue involves a question of law, we will review the issue *de novo. See K & T Enter.,* 97 F.3d at 176.

Assuming for now that the tariff does apply to Trepel, we conclude that the insurance policy provision supersedes the tariff provision for two reasons. First of all, the tariff explicitly states that the provision only applies if it does not interfere with an insurance policy. In this case, it does interfere with the transfer of rights provision in the insurance policy. Both parties cannot have the right of subrogation. It makes perfect sense that the subrogation rights of the insurance company, the innocent party, should trump the rights of the carrier, the liable party. Second, we do not think this result is altered in any way simply because the insurance company waived its subrogation rights. That waiver was for the benefit of Trepel, not the carrier. Support for this proposition can be found in a First Circuit case, *Montagna v. Aaacon Auto Transport, Inc.,* 706 F.2d 359, 359–60 (1st Cir.1983).

The carrier in that case had a benefit of insurance clause in its tariffs that was almost identical to Roadway's tariff. The shipper's insurance policy also contained a very similar provision to the one in Trepel's insurance policy. In *Montagna,* the court held that the insurance policy prevails, stating: "Following [the carrier's] argument would allow a carrier to escape the consequences of its actions whenever the shipper's insurance covered loss for which the carrier is liable." *Id.* at 360. We agree, and accordingly, we hold that the insurance policy provision prevails over the tariff provision.

**C.**

█ Roadway's last attempt to limit its liability is its argument that its tariffs contain an "inadvertence" clause to protect it from unanticipated high claims where the shipper fails to declare a value for items of extraordinary value. The tariff clause Roadway is referring to reads:

A. Articles tendered with an invoice value exceeding 50.00 per pound, per package, will be considered to be of extraordinary value. Such articles will not be accepted for transportation unless the shipper requests excess liability coverage. Articles inadvertently accepted with an invoice value exceeding 50.00 per pound, per package, but without excess coverage will be considered to have been released by the shipper at 50.00 per pound, per package.

In the event of loss of and/or damage to any shipment, the carrier's liability will not exceed 50.00 per pound, per package, subject to a maximum liability of 250,000 per shipment, unless the shipper has requested excess liability coverage.

If the shipper desires to tender a shipment requiring carrier liability in excess of 50.00 per pound, per package, or 250,000 per shipment, whichever is lower, then the shipper must indicate in writing on the bill of lading

at the time of shipment the total dollar amount of excess coverage requested. . . .

Roadway claims that the delivery receipt revealed that the serpent weighed 20 pounds; and therefore, according to the above tariff provision, Roadway should be liable for no more than $1,000. Trepel responds, once again, that he never received a bill of lading and therefore cannot be bound by its provisions. The district court addressed this issue in its opinion denying Roadway's motion for summary judgment. It held that because the carrier did not enter into an agreement to limit its liability in conformity with its tariff, that tariff does not attach.

■■■ Because this is an issue of law, we will conduct a *de novo* review. *See K & T Enter.*, 97 F.3d at 176. Motor carriers may limit their liability for an item lost or damaged to a value established by written declaration of the shipper or by written agreement of the carrier and the shipper. *See Hughes Aircraft Co. v. North Am. Van Lines, Inc.*, 970 F.2d 609, 611–12 (9th Cir.1992). In order to limit liability, four elements must be met: (1) the carrier must maintain a tariff in compliance with the requirements of the ICC; (2) the carrier must give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) the carrier must obtain the shipper's agreement as to his choice of carrier liability limit; and (4) the carrier must issue a bill of lading prior to moving the shipment that reflects any such agreement. *See id.* "The carrier has the burden of proving that it has complied with these requirements." *See id.* at 612. Furthermore, the filing of a tariff alone does not limit the carrier's liability; the shipper must be given a reasonable opportunity to choose to accept the carrier's proposed limit. *See id.*

Because TIPS was most likely aware of the tariffs in the bill of lading, Roadway contends that Trepel is charged with knowledge of the tariff, relying on the rule that all shippers and their consignees are charged with such knowledge. *See Drug & Toilet Preparation Traffic Conference, Inc. v. United States*, 797 F.2d 1054, 1061 (D.C.Cir.1986). However, we have previously held that "where a carrier is attempting to limit its liability for full actual damages, the caselaw is clear that the carrier must show more than an appropriate tariff schedule; the carrier must show, among other things, that liability was limited by a written agreement." *Baker Perkins, Inc. v. Midland Moving and Storage Co.*, 920 F.2d 1301, 1307 (6th Cir.1990) (emphasis omitted). Here, there is no written agreement to limit Roadway's liability. The delivery receipt is the only writing between the parties, and it does not contain the tariff upon which Roadway is attempting to rely. Accordingly, we hold that Roadway cannot limit its liability, and we affirm the district court's judgment in this respect.

### III.

In his appeal, Trepel claims the district court erred in three evidentiary rulings in the damages portion of the trial to Trepel's unfair prejudice. We think the district court was mistaken in two of the three rulings, and that the result was unfairly prejudicial to Trepel.

### A.

■■■ Trepel's first argument is that the district court abused its discretion by not allowing Trepel to depose Shelley Dinhofer, the owner of a Baga serpent, on the eve of trial. According to Trepel, his counsel and Roadway's counsel had an agreement to take the deposition of one of the defendant's experts in New York, immediately prior to trial. Because Dinhofer lived in New York, Trepel wished to conduct her deposition on the same day Roadway's expert's deposition was scheduled. Trepel also claims that he was accommodating defense counsel's schedule because defense counsel was out of town for 11 days prior to trial. Roadway's counsel vigorously ob-

jected to the "eve-of-trial" deposition of Dinhofer and the district court refused to order it. The district court allowed Trepel to depose Roadway's expert after trial had begun, but prohibited even a telephone deposition of Dinhofer.

■ We review a district court's decision to limit discovery for an abuse of discretion. *See Tate v. Boeing Helicopters*, 140 F.3d 654, 661 (6th Cir.1998). An abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment—a somewhat illogical definition, but one that is too well-settled to be successfully questioned at this late date. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1276 (6th Cir.1998). Matters of discovery are in the sound discretion of the district court. We should not interfere with a district court's discretionary rulings concerning the scope and timeliness of discovery unless we are convinced that the trial court's ruling resulted in substantial unfair prejudice to the complaining litigant. *See In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir.1996).

Trepel had from December 1996, when the court began to allow discovery on the damages issue, to May 1997, the trial month, to take Dinhofer's deposition. We cannot say that the district court abused its wide latitude of discretion when prohibiting the deposition, despite the parties' alleged agreement. Accordingly, we affirm the district court's judgment in this respect.

### B.

This next evidentiary issue involves a hearsay problem. The facts are as follows: Trepel recorded a telephone conversation he had with Dinhofer in January 1997. In the conversation, Dinhofer told Trepel that she had been offered $2 and later 2.5 million for her Baga serpent woodcarving, and that she turned down both offers. She also stated that she would be willing to sell the carving for $3 million if she were offered that much.

Trepel of course informed his experts about his conversation with Dinhofer. These experts indicated to Trepel that because there are very few fine Baga serpent woodcarvings in the world, and because none of them has changed hands recently, this information regarding the offers Dinhofer received and how much she would sell her carving for was important information that experts would rely upon in forming an opinion concerning the value of Trepel's carving.

Trepel attempted to introduce Dinhofer's tape-recorded statement in three ways: (1) he would testify to the conversation himself; (2) he would introduce the tape recording of the conversation; and (3) the experts would include Dinhofer's statement in their reports and would testify regarding Dinhofer's carving. Counsel for Trepel argued to the district court that Dinhofer's statement could be characterized as an offer to sell her carving, and therefore, have independent legal significance. Counsel stated they were being offered as proof that the offer was made, not for the truth of the matter asserted. However, the district court would not receive the evidence, ruling that it was inadmissible hearsay. The court redacted any mention of Dinhofer's statement from the experts' reports, and when the experts attempted to testify regarding how they arrived at their appraisal amount, the court would not permit any reference to Dinhofer's statement.

■ The Supreme Court has recently stated that all evidentiary rulings are reviewed for "abuse of discretion." *See General Elec. Co. v. Joiner*, 522 U.S. 136, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). There, the Court was not dealing with an alleged hearsay rule violation, but its sweeping "all evidentiary ruling" statement rather clearly means what it says. It is not clear to us how a trial court would have "discretion" to ignore the definition of inadmissible hearsay in Federal Rule of Evidence 801 or the foundation requirements for establishing exceptions to the

hearsay rule under Federal Rules of Evidence 803 or 804, but it is not this court's privilege to "question why." Therefore, in disregard of our heretofore well-settled precedent that hearsay evidentiary rulings are reviewed *de novo, see United States v. Fountain,* 2 F.3d 656, 668 (6th Cir.1993), we shall review the district court's ruling for an abuse of discretion.

■ Rule 801(c) of the Federal Rules of Evidence defines hearsay as a statement "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Trepel claims that his conversation with Dinhofer is not hearsay; that is to say, inadmissible hearsay, because it was not offered for the purpose of proving the truth of the matter asserted; rather, it was offered as a verbal act or verbal operative fact. *See* 2 MCCORMICK ON EVIDENCE § 249 (4th ed.1992). In other words, according to Trepel, Dinhofer's statement would have independent legal significance because it is merely the language of an offer to sell her carving. However, it is clear from the transcript of the tape-recorded conversation that Dinhofer's statement was not an offer to sell her carving to Trepel for $3 million dollars. She was declaring the high end of what she would be willing to take for it should someone make an offer to buy it. Furthermore, Trepel sought to offer the evidence for its truth; that Dinhofer thinks her carving is worth $3 million dollars. We agree with the district court's conclusion that the conversation Trepel had with Dinhofer is inadmissible hearsay. Therefore, the district court did not abuse its "discretion" in applying Rule 801 correctly.

■ However, Rule 703 of the Federal Rules of Evidence states that if facts or data are the type that are "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." This rule has frequently been interpreted to allow into evidence hearsay statements. *See*

*Engebretsen v. Fairchild Aircraft Corp.,* 21 F.3d 721, 728 (6th Cir.1994); *Kingsley Assocs., Inc. v. Del–Met, Inc.,* 918 F.2d 1277, 1286–87 (6th Cir.1990); *Mannino v. International Mfg. Co.,* 650 F.2d 846, 850–51 (6th Cir.1981). Such evidence is not admitted for the truth of the matter asserted, but may be admitted to establish the basis for the expert's opinion. *See Engebretsen,* 21 F.3d at 729. The question is whether the material sought to be introduced is of the type reasonably relied upon by experts in the field. *See Mannino,* 650 F.2d at 853. It is clear from the record that experts in the field of appraising African art, such as the carving involved here, frequently rely upon evidence of comparable sales, regardless of how that evidence comes to them. It appears from the record that the court did not consider Rule 703 when it excluded all mention of the Dinhofer serpent. We conclude that the court erred—that is, abused its "discretion"—by not allowing the experts to testify regarding the basis of their opinions.

### C.

■ Trepel's last evidentiary challenge is that the district court erred in allowing the defendant to introduce one sentence of Trepel's deposition testimony regarding the purchase price, without allowing Trepel to admit other parts of his deposition testimony in order to put the admitted statement into context.

Trepel agreed to buy the carving in a telephone conversation with Diop. Trepel testified in his deposition regarding the circumstances surrounding the sale.

A.  In substance he asked me to buy his snake.

Q.  And you knew he was talking about the same one you had seen?

A.  Yes. He asked me to buy his snake. He pleaded with me to buy his snake, and I didn't want the snake. And I tried to dissuade him as much as possible by saying such things as, "Mourtala, I don't want the snake. I don't

like the snake, and I have no use for the snake," so forth and so on.

Q. Did you mean those statements?

A. No.

Q. So you weren't telling him the truth?

A. No. I just was looking for an excuse to turn down his plea to purchase the snake....

. . . .

And he pleaded with me, he said, "Make me an offer. Offer me anything. Please make me an offer, anything, for the snake, whatever it would be." ...

. . . .

So I offered $15,000 and he immediately said sold or agreed.

Because Trepel believed that this sale did not represent the fair market value of the art work, prior to trial, he filed a motion in *limine* to exclude any evidence of the sale price. The court denied his motion and, at trial, permitted Roadway to introduce evidence, otherwise unexplained, that the purchase price was $15,000, and also admitted Trepel's deposition statement, "Mourtala, I don't want the snake. I don't like the snake, and I have no use for the snake." The district court would not allow Trepel to introduce any part of his deposition testimony regarding the conversation relating to the sale of the carving, based on hearsay grounds.

The court explained that Trepel's deposition statement, quoting himself as telling Diop he did not want "the snake" and then purchasing the carving for $15,000, were admissible as admissions of a party opponent under Federal Rule of Evidence 801(d)(2). Trepel objected to the admission, claiming that the defendant should be required to introduce the entire answer to the question, rather than just one part of the answer. The court disagreed, and Roadway was allowed to introduce the limited statement.

It is clear that the conversation between Diop and Trepel is inadmissible hearsay if Trepel was seeking to admit the statements by Diop for their truth: to prove that Diop was desperate for money. Trepel claims he was seeking to admit his own statements during the conversation in order to prove that he had no knowledge of what the carving was worth.

However, there remains the issue of whether the court properly overruled Trepel's request that Roadway be required to introduce the balance of the deposition answer in order to illuminate the context and thus the full meaning of the limited portion of the answer the court admitted. Trepel claims that Federal Rule of Civil Procedure 32(a)(4) applies here. That rule states, in pertinent part, that "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require the offeror to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts." FED. R.CIV.P. 32(a)(4). Similarly, Federal Rule of Evidence 106 states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." However, Roadway points to this court's admonition that the completeness doctrine embodied in Rule 106 should not be used to make something admissible that would otherwise be excluded. *See United States v. Costner*, 684 F.2d 370, 373 (6th Cir.1982).

Roadway was allowed to admit the deposition testimony, and in doing so, evade the bar of the inadmissible hearsay rule, because Trepel's deposition statement is an admission by a party opponent, and therefore, "not hearsay" under Federal Rule of Evidence 801(d)(2). However, Rule 32(a)(4) states that "[i]f only part of a deposition is offered in evidence by a party [ (Roadway) ], an adverse party [ (Trepel) ] *may require the offeror* [ (Roadway) ] to introduce any other part which ought in

fairness to be considered with the part introduced...." (Emphasis added.) Trepel can require that Roadway introduce enough of the deposition to put the originally admitted statement into context because Trepel's deposition answer is not hearsay if introduced by Roadway. The district court never made a determination as to which additional deposition statements should "in fairness" be introduced along with the statement Roadway introduced. We will give it the chance to do so. On remand, if Roadway wishes to introduce the "I don't want the snake" statement, and the $15,000 purchase price statement, it will be required to introduce enough of the surrounding questions and answers to put the statements into context.

## IV.

For all the reasons set forth above, we **AFFIRM** the district court's judgment regarding Roadway's issues on cross-appeal, but we **VACATE** the jury's award of damages, and **REMAND** the case for a new trial on the damages issue only.

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.

As the majority notes, we review the district court's evidentiary determinations, including those involving expert testimony, for an abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th Cir.1987).

I write separately to respectfully dissent from Part III.B. of the majority's opinion because the district court's evidentiary ruling, which excluded an out-of-court conversation concerning the value of Trepel's wood carving, was not clearly erroneous.

## I.

Trepel argues that the district court erred in excluding a variety of materials that were relied upon by his experts. Trepel's experts, Kahan and Chisolm, relied upon secondary information about the Dinhofer Baga serpent in making their appraisals. In particular, Trepel's experts relied, in part, on a conversation Trepel had with Dinhofer. In that conversation, Dinhofer told Trepel that she had been offered $2 million and $2.5 million for her Baga woodcarving, but that she would be willing to sell the carving for $3 million if she were offered that much.

I agree with the majority that this conversation was independently inadmissible under the Federal Rules of Evidence because it is hearsay. However, I disagree with the majority that the rules of evidence allow the introduction of this conversation as the basis for an expert opinion.

Rule 703 of the Federal Rules of Evidence states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type *reasonably relied upon by experts* in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed.R.Evid. 703 (emphasis added)

The Rule was intended to "bring judicial practice into line with the practice of the experts themselves when not in court" by broadening the permissible bases for expert opinions that had previously been limited at common law. Fed.R.Evid. 703, Advisory Committee Notes.

However, the rule does not give an expert free reign to base an opinion on any evidence, including inherently unreliable or untrustworthy evidence. Rather, the rule limits the bases of expert opinions to that which is "reasonably relied upon by experts." Fed.R.Evid. 703. The rule was not meant to allow unreliable and untrustworthy evidence to be introduced to the court through the use of an expert witness. Instead, the Advisory Committee Notes caution that Rule 703 limits the bases of

expert opinions to otherwise inadmissible evidence that is also reliable in order to prevent Rule 703 from creating a "backdoor" exception to the other rules of exclusion:

> Thus, a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X-rays ... The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes ... If it be feared that enlargement of permissible data may tend to break down the rules of exclusion unduly, notice should be taken that the rule requires that the facts or data "be of a type reasonably relied upon by experts in the particular field." The language would not warrant admitting in evidence the opinion of an "accidentolologist" as to the point of impact in an automobile collision based on statements of bystanders since this requirement is not satisfied.

Fed.R.Evid. 703, Advisory Committee Notes; *see also* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6272 (1997) ("[B]ecause Rule 703 permits expert testimony to be based on inadmissible evidence, the provision necessarily must concern itself with the reliability of that testimony.... An expert opinion based on inadmissable evidence such as hearsay can pose the same sorts of reliability problems as the inadmissible evidence on which it is based.").

The cases cited by the majority merely stand for the general rule that an expert may base an opinion on otherwise inadmissible evidence. They do not stand for the proposition that such inadmissible evidence need not be reliable since each of the cited cases involved expert opinions that were based on reliable information. *See Enge-*

*bretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728–29 (6th Cir.1994) (court allowed experts' testimony based on their investigations of the airline's emergency landing, which included wiring diagrams, reports, tapes, pilots' statements, and various tests conducted on the airplane, but the court also noted that "Rules 702 and 703 *carve out a narrow exception to the rule against the admission of hearsay.*") (emphasis added); *Kingsley Associates, Inc. v. Del–Met, Inc.*, 918 F.2d 1277, 1286–87 (6th Cir.1990) (expert testimony based on hearsay, which included the expert's research into the automobile industry and confidential documents from General Motors, was admissible); *Mannino v. International Mfg. Co.*, 650 F.2d 846, 852 (6th Cir.1981) (expert testimony based on the expert's experience with bio-mechanics, various studies, and articles in that field was admissible since those are proper bases for expert opinions under Rule 703 ). These cases do not remove from the court its obligation to ensure that the basis of an expert's opinion is both reliable and reasonable since none of the cases cited by the majority involved the type of unreliable double, and, even, triple hearsay, involved in the case at bar.

As the majority correctly points out, experts frequently rely on comparable sales evidence when appraising the value of property. The majority concedes, however, that the conversation between Trepel and Dinhofer was not a comparable sale, but a mere offer. Since there is no comparable sale evidence, we must look to the evidence that was relied upon and decide whether it is trustworthy enough to constitute the type of evidence that an expert could reasonably rely upon.

In this case, Trepel seeks to admit evidence of an out-of-court conversation that he had with Dinhofer to establish the amount of his damages. Not only was the conversation inadmissible hearsay, but the conversation is inherently untrustworthy as it directly serves Trepel's financial self-interest in this case. The conversation

involved hearsay within hearsay that was speculative in nature. There is no way for the court to determine whether, or how, or under what circumstances the conversation took place, or to verify the substance of the conversation and its accuracy. It is also impossible to determine whether the party who made the $2 million offer would have followed through with the sale, or whether the offer was made in the first place, or how it was made.

To allow this conversation to be used as the basis for an expert opinion would be akin to giving Trepel the ability to name his price in damages. Unlike the cases cited by the majority above and the example of a physician's testimony discussed by the Advisory Committee Notes to Rule 703, there is no indicia of reliability or trustworthiness to make Trepel's out-of-court and self-serving conversation a reasonable basis for an expert opinion.

Moreover, "the Rules of Evidence ... assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, —— —— ——, 119 S.Ct 1167, 1174–75 (1999) (applying *Daubert* gatekeeping role of trial judges to all expert testimony). Although it is true that an expert may base an opinion on otherwise inadmissible evidence, the courts are constantly looking behind an expert's opinion to determine if the basis for that opinion is reliable and trustworthy. *See, e.g., Dallas & Mavis Forwarding Co., Inc., v. Stegall*, 659 F.2d 721, 722 (6th Cir.1981) ("We agree with the district court that under [Rule 703] the opinion of the trooper was not admissible, because it was based on no physical evidence ... and was derived primarily from the story of a biased eyewitness. This is the sort of hearsay testimony whose admission the Rule [703] was meant to foreclose."); *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 n. 6 (5th Cir.1994) ("Experts gen-

erally may rely on hearsay, however, *if the data is reliable* and qualified under Rule 703") (emphasis added) (citation omitted); *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir.1990) ("Given the obvious concern over the trustworthiness of a statement made under circumstances such as these, we cannot say that the district court abused its discretion in preventing the plaintiff's medical expert from reading from [the] letter or otherwise stating that his opinion was based on the letter" when the letter was presumably for the purpose of getting disability benefits for the decedent in the malpractice lawsuit, who was also the likely source of the letter's information); *Ricciardi v. Children's Hosp. Med. Center*, 811 F.2d 18, 24–25 (1st Cir.1987) (holding the district court's decision not to allow an expert to rely on a note found in a hospital record was within the court's discretion because the court found that the note was too unreliable to be used as the basis for an expert opinion); *Soden v. Freightliner Corp.*, 714 F.2d 498, 503–06 (5th Cir.1983) (court did not abuse its discretion when it excluded an expert's opinion that was based on unreliable accident statistics); *In re "Agent Orange" Product Liab. Litig.*, 611 F.Supp. 1223, 1245 (D.C.N.Y.1985) ("Rule 703 permits experts to rely upon hearsay.... Nevertheless, the court may not abdicate its independent responsibilities to decide if the bases meet minimum standards of reliability as a condition of admissibility. If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.") (citations omitted).

By ensuring that an expert's opinion is based on reliable information, the courts prevent the abuse of expert testimony by those who seek to use experts as a pretense for the admission of otherwise inadmissible and unreliable hearsay. *See* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6273 (1997) ("... Rule 703 does not

authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury. In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control."); *see also Law v. National Collegiate Athletic Association*, 185 F.R.D. 324, 341 (D.Kan.1999) ("The NCAA basically presented [the expert] as a channeler, seeking to present non-expert, otherwise inadmissible hearsay through the mouth of an economist.").

Given the inherent unreliability and untrustworthiness of Trepel's out-of-court conversation with Dinhofer, I cannot say that the district court was clearly erroneous when it excluded that conversation from the experts' reports and testimony.

## II.

For these reasons, I respectfully dissent from Part III.B. of the majority's opinion.