**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Glover G. GRAY, Defendant–Appellant.**

**No. 00–5952.**

United States Court of Appeals,
Sixth Circuit.

Nov. 19, 2001.

Before NELSON, DAUGHTREY and MOORE, Circuit Judges.

DAUGHTREY, Circuit Judge.

Following a trial in which the jury convicted the defendant, Glover Gray, of four counts of bank fraud and six counts of possession of counterfeit securities, the district court sentenced Gray to concurrent 37–month prison terms and to five years of supervised release, and ordered restitution in the amount of $10,000. In reaching his sentencing determination, the district judge concluded that the defendant had intended to cause a monetary loss in excess of $4 million. Gray now insists that such a finding was improper and that the district court also erred both in excluding from evidence a tape recording of a threatening telephone call to the defendant and in allowing the prosecution to introduce certain rebuttal testimony. We conclude that the district court correctly calculated the loss intended by Gray and did not commit reversible error in its evidentiary determinations. We therefore affirm the judgment of conviction and the sentence imposed.

## FACTUAL AND PROCEDURAL BACKGROUND

Late in the afternoon on May 22, 1997, Gray entered a Memphis branch of Union Planters Bank where he had an account in his name, doing business as Oaktree International. At that time, he presented for deposit into his account a cashier's check for $4 million from Fairfield Savings Bank near Chicago. The teller assisting Gray refused to accept the check, however, because it had not been signed by the maker of the instrument.

The following morning, Gray again appeared at the Union Planters branch and again offered the check, this time signed by the purported maker, for deposit into the defendant's own account. After telephoning Fairfield Savings Bank and receiving verification that the check was theirs, the Memphis bank accepted the deposit and allowed Gray to withdraw $10,000 from his account in a combination of cash and traveler's checks. Throughout the remainder of that morning, Gray continued to telephone the bank to request the release of the remaining funds from the deposited check. Specifically, the defendant asked Union Planters to wire the money to a bank in New York for eventual transfer to an account in the Cayman Islands. The employees of the Memphis bank consistently informed Gray that a hold had been placed on the remaining funds, pending further verification, because of the unusually large amount of the check. Later that same day, the defendant personally returned to the bank in a purple Dodge Stratus and asked to speak with the branch manager regarding the release of the money. The funds were never cleared for release, however, because a final phone call to the Fairfield Savings Bank revealed that the $4 million check was not in fact valid and had not

been prepared using Fairfield's automatic imprint machine.

A little over a year later, Gray again began depositing counterfeit checks in his accounts, this time at Nations Bank branches in Memphis. As he had done earlier, he withdrew cash amounts allowed by the bank pending verification of the deposited funds. Finally, however, Secret Service agents were alerted to the defendant's activities, confronted him, and requested that Gray follow them to their office for an interview. The defendant did so, and during the course of the discussion, consented to a search of his vehicle where the agents recovered cash Gray had withdrawn earlier from one Nations Bank branch. A subsequent search of the defendant's apartment conducted under the authority of a warrant furthermore revealed equipment useful in printing counterfeit checks and two such negotiable instruments.

At trial, Gray testified in his own defense and, while not denying his wrongdoing, claimed that he performed any illegal activities only under duress. He explained that, on a previous trip to Africa, his passport had been stolen by a criminal ring operating on that continent. Then, Gray said, upon his return to the United States he was contacted by members of the ring and forced to pass the counterfeit checks for them or risk harm to his family and friends.

After considering the evidence presented to it, the jury discredited Gray's explanation for his actions and found the defendant guilty of all charges made against him. At sentencing, the district court then concluded that, although the unrecovered monetary loss of the victims of the defendant's crimes was only $10,097, the "intended loss" included the additional amounts of the deposited checks that Gray was unable to access from his accounts at the times he attempted to do so. Considering those amounts, and the fact that more than minimal planning was involved in the perpetration of the offenses, the court sentenced Gray as a criminal history category I, offense level 21 offender to 37 months in prison. From that sentencing determination, and from certain evidentiary rulings made during trial, Gray now appeals.

## DISCUSSION

### I. Exclusion of Tape Recording of Threatening Telephone Call

■ Gray's defense to the charges against him required that he establish, to the satisfaction of the jury, that he committed the illegal acts listed in the indictment only because he genuinely believed he and his family would be harmed by members of a crime syndicate if he did not comply with their alleged demands upon him. In an attempt to satisfy that evidentiary burden, the defendant sought to introduce into evidence a tape recording of a telephone conversation with an unidentified individual who allegedly threatened Gray with harm shortly before the trial in this matter. The district judge denied that request, however, ruling that the taped conversation was unauthenticated, was "far removed" from the criminal acts in question, was so difficult to understand as to be unreliable, and constituted inadmissible hearsay.

Such a decision on whether to admit tape recordings into evidence rests within the sound discretion of the trial court. *See United States v. Robinson,* 707 F.2d 872, 876 (6th Cir.1983). In this case, we find no abuse of discretion.

First, defense counsel did not, and indeed could not, dispute the fact that a telephone call in April 2000 was of limited relevance to the defendant's state of mind

in the summers of 1997 and 1998. Second, Gray's failure to contest the prosecution's representation of the difficulty in identifying speakers and in understanding the recorded conversation supports the district judge's evidentiary ruling. Finally, and most convincingly, the court did allow the defendant himself to testify concerning the threats made against him and his family.

Gray nevertheless insists that he was prejudiced by the district court decision because hearing an actual threat delivered by an irate third party would have solidified in the minds of the jurors the duress under which the defendant operated. While it is indeed likely that corroboration of Gray's allegations may have had some effect upon the jury, the remaining concerns of the court about the authenticity, relevance, and quality of the recording were not addressed satisfactorily by the defendant. Absent any indication that the challenged tape recording met minimal standards for admissibility, no reversible error was committed by the district court in refusing to allow the jury to hear the tape recording.[1]

## II. Admission of Rebuttal Evidence

■ The defendant further contends that the district court erred in allowing the prosecution to offer rebuttal testimony by two witnesses, Beverly Moranville and Larry Simpson. As with all other evidentiary rulings, we review such a claim of error only for an abuse of discretion. *See, e.g., Trepel v. Roadway Express,* 194 F.3d 708, 716 (6th Cir.1999) (citing *Gen. Elec.*

*Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Gray submits that the rebuttal evidence was offered for the sole purpose of attacking his credibility, through use of extrinsic facts, after the conclusion of his examination at trial. According to Gray, such use of testimony is, however, expressly forbidden by Rule 608(b) of the Federal Rules of Evidence, which provides, in pertinent part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

We conclude that any error in the introduction of the testimony in question was harmless at most, because the evidence was actually relevant for purposes other than an attack on Gray's credibility. During his trial testimony, the defendant maintained that he had performed the illegal acts for which he was arrested only out of fear that certain crime syndicate members would inflict bodily harm upon him and upon his family. He further claimed that, in order to demonstrate his lack of

---

1. On appeal, the prosecution argues that the district court also properly determined that the recording was inadmissible because it "would be just plain old hearsay." Hearsay evidence, however, is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The state-

ment at issue in this evidentiary challenge was not offered to prove the truth of any statement that the declarant would harm Gray or Gray's family. Instead, the statement was offered only to show the effect it could reasonably be expected to have on the hearer. Thus, although inadmissible for other reasons, the tape recording was not excludable on hearsay grounds.

criminal intent, he turned over all money he obtained from his criminal activities to the persons directing his actions and performed all necessary acts demanded by the syndicate notoriously and in his own name. To contradict the innocent light in which Gray cast his activities, the prosecution first questioned Beverly Moranville, a travel agent, about the defendant's use of traveler's checks received from the $4 million deposit to purchase an airline ticket for one of Gray's friends, Ty Wilson. Moranville stated that, when he bought the ticket, the defendant did not provide the travel agency with Wilson's correct address, but rather indicated that Wilson lived at an address later determined to be registered to Gray's mother.

The government also presented the testimony of Larry Simpson, another friend of the defendant. Simpson's testimony established that, on the day Gray deposited the $4 million check, the defendant asked Simpson to rent a small vehicle for Gray in Simpson's name. Gray himself, however, provided the funds for the transaction.

Although the testimony of the rebuttal witnesses did contradict claims made by Gray during his testimony, that evidence was not relevant only to establish that Gray was not a credible witness. Rather, the rebuttal testimony also served to contradict the defendant's claims of innocence and establish the more sinister motives and intent necessary to support convictions on the offenses charged in the indictment. Because use of such evidence for such purposes is not proscribed by any rule of evidence, we conclude that no reversible error occurred as a result of the district court's decision to admit the government's rebuttal testimony.

### III. Calculation of Intended Loss for Sentencing Purposes

■ Finally, Gray contends that, even if his convictions were proper, the district court erroneously sentenced him based upon the fact that the defendant intended to cause losses to the various victims in excess of $4 million. Gray argues that internal bank protective measures prevented him from ever accessing the entire $4 million amount of the first counterfeit check and that, consequently, he should be held accountable only for the money actually determined to be unrecovered by the banks.

In reviewing a district court's conclusion as to the loss involved in a criminal episode, we examine the applicable provisions of the sentencing guidelines *de novo*. *See United States v. Fleming*, 128 F.3d 285, 287 (6th Cir.1997). A sentencing court's factual findings, however, must be upheld unless they are clearly erroneous. *See id.*

Neither Gray nor the prosecution dispute the propriety of applying the provisions of § 2F1.1 of the United States Sentencing Guidelines to the sentencing calculus to be used in this matter. Pursuant to that section, a base offense level of 6 is assigned to any offense involving altered or counterfeit instruments. *See* U.S. SENTENCING GUIDELINES MANUAL § 2F1.1(a) (1998). Pursuant to § 2F1.1(b), however, the applicable offense level may be increased commensurate with the monetary loss suffered by the victims. Furthermore, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S. SENTENCING GUIDELINES MANUAL § 2F1.1, cmt. n. 8 (1998).

In *United States v. Watkins*, 994 F.2d 1192, 1196 (6th Cir.1993), we recognized that three factors must be present before a sentencing court may properly increase a defendant's punishment based upon "in-

tended loss" to the victims. "First, ... the defendant must have intended the loss. Second, it must have been possible for the defendant to cause the loss. Third, the defendant must have completed or been about to complete but for interruption, all of the acts necessary to bring about the loss." *Id.* For purposes of this appeal, Gray concedes that he intended to cause the banks a loss in excess of $4 million when he deposited the checks in question, withdrew small portions of those deposits, and then demanded that the remaining balance of one account be wired to another bank for ultimate deposit into an account in the Cayman Islands. Similarly, the defendant admits that he undertook all acts necessary to bring about that loss. He vehemently denies, however, that it was "possible" for him to cause such loss, given the intricate safety provisions in place within the banking industry.

The government counters that it was indeed "possible" for the defendant to cause the greater intended loss. In fact, had Union Planters Bank not checked an additional time with the Fairfield Savings Bank regarding the legitimacy of the check deposited by Gray, the funds in the defendant's account would have been wired offshore. According to the prosecution, it is only legal or factual impossibility inherent in the criminal activity that will prevent the application of the intended loss provisions of the guidelines. Relevant case law does support the position advocated by the government. The increased sentencing available for intended losses has been disallowed only in those instances where factors outside the control of the defendant and the victim prevented the completion of crimes to the extent contemplated by the perpetrators. *See, e.g., United States v. Khan,* 969 F.2d 218 (6th Cir.1992) (involving the making of fraudulent claims for *increased* Social Security benefits when all records showed that the

defendant was not entitled to *any* such payments because he had not worked the requisite number of quarters); *United States v. Santiago,* 977 F.2d 517 (10th Cir.1992) (involving an insurance claim for $11,000 on a vehicle with a blue book value of only $4,800); *Watkins* (analyzing a check kiting scheme in which the court noted that the full amount of each check deposited could not be counted in the loss figure because some portion of the checks were transferred to other accounts, thus resulting in double-counting of monetary loss values).

In this case, however, the bank's loss of the entire amount of the check was a factual and legal possibility. Prior inquiries to Fairfield Savings Bank had caused the Memphis bank branch to believe Gray's check was legitimate. Based upon such representations, Union Planters might well have eventually wired the money remaining in the account in accord with the defendant's instructions. Only a final phone call to the out-of-state bank, a precaution that was not at that point mandated, prevented that greater loss by the victim. Because the requirements delineated in *Watkins* for increasing a defendant's base offense level to account for intended loss have been met in this case, we conclude that the district court did not err in holding Gray responsible for criminal activity potentially involving more than $4 million.

## CONCLUSION

None of the three issues raised on appeal by the defendant constitute reversible error. We thus AFFIRM the judgment and sentence ordered by the district court.