NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0232n.06

No. 10-2340

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Feb 28, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| JOSE A. SANDOVAL, | ) | |
| | ) | O P I N I O N |
| Defendant-Appellant. | ) | |

BEFORE:     SUHRHEINRICH, GIBBONS, and McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.**     Defendant-Appellant Jose A. Sandoval was convicted in a jury trial for obstructing justice in violation of 18 U.S.C. § 1503 by interfering with a material witness's giving of truthful testimony. He seeks reversal of his conviction, arguing that it rests on evidence improperly admitted under Federal Rule of Evidence 404(b). Because the evidence was properly admitted to show intent, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Defendant Sandoval is an attorney who primarily practiced in immigration, though he sometimes assisted his immigration clients who needed legal representation on other matters. Beginning in late 2008, he represented Harlenne Perez Trujillo ("Perez") in a series of actions that eventually led to the case at hand.

*Preliminary Events*

In November 2008, Perez was put under an order of removal by Immigration and Customs Enforcement ("ICE") because she had been deported before and had reentered the U.S. without authorization. Sandoval represented her in the removal proceedings. Federal ICE agents had also acquired evidence that Perez was involved in making fraudulent documents such as false driver's licenses, permanent residency cards, and the like. This evidence was acquired with the help of ICE informant Benjamin Garcia Garcia ("Garcia"). In order to buy more time to continue the document fraud investigation, ICE consulted with the U.S. Attorney's office and decided to charge Perez with violating 8 U.S.C. § 1326(a), which prohibits unauthorized reentry after deportation. Thus, Perez's removal proceeding, which was an administrative immigration proceeding, changed to a criminal prosecution. Sandoval continued his representation of Perez in this new criminal matter.

During the pendency of Perez's reentry case, the Government advised Sandoval that his client was also being investigated for document fraud. The lawyers spoke of a proffer but could not come to an agreement, and Sandoval testified that he did not think much of the investigation at first because Perez denied that she was involved. On December 22, 2008, Perez appeared before the district court and pleaded guilty to the reentry charge. At that appearance, one of the Government attorneys informed the court that Perez was also being investigated for document fraud.

*The Document Fraud Case Against Perez*

Sandoval testified at his trial that throughout his representation, Perez maintained that she was innocent of document fraud and told him that someone named Miguel Najera ("Najera") could

verify her innocence. Perez, however, testified that she told Sandoval she and Najera were both involved in the fraudulent document scheme.

ICE learned from Garcia that Najera was also involved in document fraud. On December 24, 2008, while Najera was being held in Kent County Jail for a traffic violation, ICE Agent Gwyn paid him a visit. Gwyn falsely claimed that Perez had implicated him in document fraud, and Najera then confessed to trafficking in false documents with Perez. Soon after, Najera was taken into custody as a material witness pursuant to 18 U.S.C. § 3144 in the grand jury investigation of Perez. Assistant Federal Public Defender Sean Tilton ("Tilton") was appointed as Najera's counsel. On February 10, 2009, Najera testified before a federal grand jury that he, Perez, and Perez's domestic partner, Abel Barrera ("Barrera"), were involved in trafficking fraudulent documents, and an indictment issued against Perez charging her with related crimes. Sandoval continued his representation of Perez.

Throughout this time, Sandoval kept Perez's family apprised of her case. He spoke over the phone with Barrera, who had previously been removed from the U.S. and was waiting for Perez at the U.S.–Mexican border. Sandoval mentioned to Barrera that Najera was cooperating against Perez, and Barrera informed Sandoval that Najera was operating under a false name.[1] Sandoval asked Barrera to obtain documentation proving Najera's identity so he could challenge Najera's credibility.

---

[1]Up to that point, Najera was known as "Marcos Guerrero" to Sandoval and the other attorneys involved in the documents case.

Najera's deposition was scheduled for February 24, 2009, the same day Perez was scheduled to be arraigned on the document fraud charges. Sandoval testified that they planned to enter a plea of not guilty at the arraignment.

*Sandoval's February 22 Jail Visit to Najera*

On February 22, 2009, Sandoval visited Perez in the Newaygo County Jail to talk about the upcoming arraignment and deposition. Sandoval's meeting with Perez was interrupted by another visitor. Because their meeting was not over, Sandoval decided to wait for Perez to see her other visitor. While he was waiting, Sandoval asked to see Najera, who was being held at the same facility. Sandoval testified that at the time, he was unaware he was doing anything wrong because he did not know there was a difference between regular witnesses and material witnesses. Perez and Barrera, however, testified that Sandoval told them he could not talk to Najera because Najera was represented by a lawyer.

The jail surveillance video showed that Sandoval and Najera met in a small meeting room for approximately 11 minutes. The men exited the room and talked for about three more minutes in the hallway. Najera testified that Sandoval asked him to change his testimony at the deposition, saying that he would only get six months in jail for lying in court, and advised him to fire his attorney. Najera testified that he told Sandoval that his grand jury testimony was the truth but that Sandoval still told him to change it.

Sandoval testified that he first identified himself as Perez's attorney and Najera then began discussing how he felt about having a public defender. Najera remarked that it must be nice to have a private attorney and told Sandoval that he couldn't communicate with his attorney due to the

language barrier. Sandoval told Najera he knew Najera was not going by his real name. Najera stayed quiet for a few seconds and said "they got me." He asked Sandoval what would happen if he changed his testimony. Sandoval said that it could be perjury, advised him to consult his attorney, and asked Najera to tell the truth. He also told Najera that no one is obligated to keep their attorney. Najera then resumed complaining about his inability to communicate with the public defender. On the way out, Najera again asked Sandoval what the penalties might be if he changed his testimony. Sandoval answered that it might be six months to two or three years, depending on a person's criminal history, and repeated that Najera should talk to his attorney.

Sandoval then went back to see Perez and told her he met with Najera. Perez testified that she asked Sandoval whether he was going to get in trouble for seeing Najera, since Sandoval had told her that he couldn't speak to him, and that Sandoval responded he signed the jail log book only to see Perez, not Najera. Records showed that on February 22, Sandoval signed his name and date in the jail log book but did not write down who he was going to see. Perez also stated that Sandoval suggested she send Najera a note persuading him not to testify against her and to fire his attorney. Sandoval denied mentioning the log book to Perez and emphasized that he knew there was surveillance at the jail.

*The Postponed February 24 Deposition and Aftermath*

On February 24, 2009, Perez and Najera were transported in the same van from Newaygo County Jail to the courthouse in Grand Rapids for the arraignment and deposition. During the van ride, Perez and Najera spoke about Najera's meeting with Sandoval. Perez testified that she told Najera what Sandoval had told her—that if he recanted his grand jury testimony he would be in jail

for a short time for perjury and if he fired his attorney, Mr. Sandoval would be able to visit him. She stated that Najera responded he would recant if Perez paid for a private attorney. Najera testified similarly, stating that Perez told him to recant his testimony, everything would be fine, and that Perez would get him an attorney when he fired the public defender.

When they arrived at the courthouse in Grand Rapids, Najera told his attorney Tilton that Sandoval had come to see him in jail and asked him to change his testimony and fire his attorney. Tilton brought this to the attention of his supervisor, Federal Public Defender Ray Kent ("Kent"), and, without disclosing specifics, the defenders requested an adjournment. Magistrate Judge Scoville granted the request, and the deposition was rescheduled for March 5.

After the deposition was postponed, Sandoval approached ICE Agent Gwyn, the investigating case agent for the document fraud case against Perez, and broached the subject of a proffer, but they did not come to an agreement. Gwyn then mentioned Perez's case going to trial, to which Sandoval responded that he didn't see the case going to trial as Perez would probably plead guilty. Sandoval admitted he had made that comment but said it had simply been his opinion, he had not discussed it with Perez, and Perez had always maintained her innocence.

Najera and Perez were transported back to Newaygo in the same van. Najera told Perez he told his attorney everything, and Perez told Najera that there would be another deposition at which he should recant his grand jury testimony. Back at the jail that same day, February 24, Perez sent a note to Najera that mentioned providing a lawyer for him and told him to "trust us." That evening, Perez made a third-person call through her stepfather in Grand Rapids to Barrera in Mexico. She informed Barrera that Najera was willing to recant his testimony but that they would have to pay for

a lawyer for him. She also asked Barrera to let Sandoval know she had successfully spoken to Najera.

The next day, February 25th, Sandoval called Tilton several times and left a message saying he would go see Najera unless Tilton called him back. Tilton called Sandoval back and told him not to see Najera unless Tilton was present, to which Sandoval responded that he did not think the law prevented him from seeing Najera. On February 26, Sandoval called Judge Scoville's chambers seeking permission to speak to Najera. He was told that he would have to get all the other attorneys on the line before the judge would speak with him or that he could file a motion if he wanted a hearing on the matter.

On February 27, Federal Public Defender Kent met with Judge Scoville to ask whether the Defender's Office had a duty to report Sandoval's conduct to the state bar or to law enforcement. Kent posed the question as a hypothetical but Judge Scoville realized he was talking about Sandoval. Judge Scoville then scheduled a status conference for March 3.

*The March 3 Status Conference*

At the status conference, Sandoval argued that he should be allowed to see Najera because Najera's family had communicated to Sandoval that Najera wished to speak to him. Judge Scoville asked Sandoval whether he had ever had contact with Najera, and Sandoval sidestepped the question by answering that he had contact with Najera months before the document fraud case began but did not mention he had seen Najera in the Newaygo County Jail the previous week. Judge Scoville then asked Sandoval point blank, "Did you talk to [Najera] directly or indirectly while he was detained under order of the court?" Sandoval lied to the Judge, saying, "No, Your Honor. Again, it was

through other persons who he made known to me that he wanted to talk to me . . . . I haven't talked to him directly or otherwise, sent him messages or anything like that, no, especially with the strong advice from his counsel." Sandoval admitted he lied to the Judge and testified that he was nervous because he had consulted with three different people after visiting Najera and realized he was on shaky ground, though still not entirely sure whether he had done something wrong. He stated that by the time Judge Scoville asked him the direct question, he was "really scared" and "didn't know what the hell [was] going on" and "wanted the court to rule on the merits of my argument as to access to the witness without considering what may have been wrong by me."

*The March 5 Deposition*

Sometime in between the postponed deposition on February 24 and the rescheduled deposition on March 5, Najera received a letter from his girlfriend, Dulce Esquivel, that informed him Barrera had visited Najera's family in Mexico asking for documents and had been calling Esquivel asking her to tell Najera to fire his attorney. Najera testified that after reading the letter, he became afraid. He was afraid of Barrera because he heard Barrera had been involved in a murder.

At the deposition on March 5, Najera told Tilton about the letter from his girlfriend and that he did not want to testify. The deposition proceeded anyway, and Najera stated early on that he did not want to make a statement. Assistant U.S. Attorney Frank ("Frank") continued to ask him questions, and Najera began testifying inconsistently with his grand jury testimony, denying that he sold fake documents for Perez. Najera stated at trial that he lied during this deposition. After some attempts to persuade Najera to tell the truth, Kent and Tilton disclosed the letter to Frank, explaining that the letter was why Najera was testifying inconsistently. Najera, with his counsel, then met with

Government attorneys in a proffer meeting during which the Government learned that Sandoval had visited Najera in jail on February 22.

*The Case Against Sandoval*

After the Government learned that Sandoval had visited Najera in jail, the case changed course and became an investigation and eventual prosecution of Sandoval. Perez was appointed new counsel and proceeded to cooperate with the Government in Sandoval's prosecution in exchange for dismissal of the document case, work authorization, and immigration benefits for herself, Barrera, and her children. Barrera and Najera also received work authorization and similar immigration benefits in exchange for their cooperation.

Sandoval was ultimately indicted on two counts. First, he was charged with corruptly influencing, obstructing, and impeding, or endeavoring to influence, obstruct, or impede, the due administration of justice in violation of 18 U.S.C. § 1503 "by committing numerous acts designed to interfere with the giving of truthful testimony by a material witness for the United States[.]" Second, he was charged with willfully suborning and procuring Najera "to commit perjury by testifying falsely under oath to a material matter in [the Perez documents case]."

*The Rule 404(b) Motion*

Prior to trial, the Government notified the defense of its intent to offer, under Federal Rule of Evidence 404(b), evidence of Sandoval's actions in an immigration proceeding unrelated to the Perez case. Garcia, the informant who initially told ICE about Perez's and Najera's fraudulent activities, was a former client of Sandoval's. He would testify that in 2007, Sandoval advised him

to falsely attest on an immigration form, and subsequently claim in a sworn interview, that he had never previously been deported.

Sandoval filed a motion in limine objecting to the evidence. The district court ruled that the Government could not offer the evidence in its case in chief but could refer to it on cross examination and call Garcia for rebuttal if Sandoval chose to testify. It cited *United States v. Colon*, 880 F.2d 650 (2d Cir. 1989), as the basis for its ruling. The defense renewed its objection at trial based on information from an interview with Garcia that the Government had turned over to the defense the night before, which revealed that Garcia claimed not only that Sandoval had advised him to lie in the 2007 matter but that Sandoval's supervising attorney at the time had also advised Garcia to lie about the same matter in 2001. The argument was that this new evidence cast doubt on whether the prior act—the advice to lie—ever occurred. The district court stated it was "not going to get that deep into this," and told defense counsel that "the way you are proceeding we are going to have another trial." The court then enforced its ruling.

*Sandoval's Trial*

In addition to the foregoing testimony from Perez, Najera, Barrera, Tilton, Kent, and Sandoval, the Government presented testimony from Alex Murrieta, Perez's cousin, and Garcia. Murrieta testified that in April 2009, after Sandoval became the target of an investigation, Sandoval contacted him and asked to meet him in an Office Max. Sandoval told Murrieta he was going to be removed from Perez's case, that he had done something he didn't think would cause a problem but would now cost him his law license, and that Perez could cooperate if she wanted but should "take into account everything he had done [for] them."

Garcia testified twice during the course of trial. He testified in the Government's direct case that he sought Sandoval's legal advice when his permanent residency application was denied and that Sandoval presented him with the option of becoming an informant for ICE. Garcia also testified that he informed on Perez and Najera.

Sandoval was the sole witness for his defense. On cross examination, he was asked about his former representation of Garcia. In October 2007, Sandoval had signed an I-485 form for Garcia, attesting that Garcia had never previously been deported from the U.S. An I-485 form is submitted under penalty of perjury. Sandoval denied that he knew Garcia had in fact been deported before and that he advised Garcia to lie on the form and at the follow-up interview. On redirect, Sandoval explained that "deportation" is a legal term of art. If someone is simply turned away at the border without any legal proceeding, it is not a deportation. If, however, a person takes part in an interview and falsely misrepresents him or herself as a U.S. citizen, then it would count as a deportation. Sandoval testified that Garcia had not told him the critical information that he had falsely represented himself as a U.S. citizen. Garcia told him that he had been stopped at the border and fingerprinted but nothing more. Sandoval contacted the border point where Garcia had crossed and did not find any information. Thus, Sandoval signed the I-485 form believing Garcia had never been deported. Sandoval stated that only later, when Garcia received notice to appear for an interview, Garcia remembered and told Sandoval that he had portrayed himself as a citizen at the border. Sandoval told him that he could be detained at the interview and that he could not qualify for permanent residency. Garcia went to the interview anyway and returned to Sandoval's office when he received

a notice of denial. It was then that Sandoval contacted ICE to see if they had any interest in Garcia as an informant.

The Government called Garcia again as a rebuttal witness. Garcia testified that he told Sandoval from the beginning that he had been deported for misrepresenting himself as a U.S. citizen. He said Sandoval advised him to lie on the I-485 form and again at the interview about never having been deported. Garcia asked Sandoval to accompany him to the interview, but Sandoval told him it would be expensive to retain him for the meeting. Garcia, however, got the money together and asked Sandoval again, but Sandoval told him he was busy with other court appointments that day. Garcia also testified that Sandoval told him if he got caught, he should say Sandoval was unaware of the situation.

The Government's theory of the case was that Sandoval knew all along Perez was involved in document fraud, that he endeavored to get Najera to change his testimony knowing that the changed testimony would be false, and that he tried to cover up his tracks after the February 22 meeting by seeking a legitimate meeting with Najera and lying to Judge Scoville. Sandoval's defense was that he believed Perez was innocent and thus had not encouraged Najera to give false testimony.

The jury was given the following limiting instruction:

You have heard testimony that the defendant committed acts and wrongs other than the ones charged in the indictment. If you find the defendant did those acts and wrongs, you can consider the evidence only as it relates to the government's claim on the defendant's intent or absence of mistake or accident. You must not consider it for any other purpose.

The jury returned a verdict of guilty on the obstruction of justice charge but acquitted Sandoval of

suborning perjury. Sandoval appeals the admission of Garcia's rebuttal testimony as improper under

Rule 404(b).

## II. ANALYSIS

**A. Standard of Review and Applicable Law**

Federal Rule of Evidence 404(b) provides:

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

This Circuit has outlined a three-step process to determine the admissibility of evidence

under 404(b). First, the district court must decide whether there is sufficient evidence that the other

acts actually occurred. *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002). Second, the

court must decide whether evidence of the other acts is admissible for a legitimate purpose, meaning

that it is "probative of a material issue other than character." *Id.* (quoting *United States v. Johnson*,

27 F.3d 1186, 1191 (6th Cir. 1994)). Third, the court must apply Rule 403 to determine whether the

probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Id.*

Sandoval challenges the district court's determination at each step.

The standard of review governing these steps is an area of continuing inconsistency in our

circuit. This disagreement is centered on the proper interpretation of the Supreme Court's decision

in *General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997), which stated broadly that "abuse of

discretion is the proper standard of review of a district court's evidentiary rulings" and specifically

applied the standard to review a district court's exclusion of expert scientific evidence under Rule 702. Relying on *Joiner*'s pronouncement, this court held that hearsay evidentiary determinations are reviewed for an abuse of discretion, departing from precedent that such determinations were to be reviewed de novo. *Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 716-17 (6th Cir. 1999). In so holding, we noted the oddity of applying an abuse of discretion standard to evidentiary determinations that are, in essence, questions of law. We stated, "It is not clear to us how a trial court would have 'discretion' to ignore the definition of inadmissible hearsay in Federal Rule of Evidence 801 or the foundation requirements for establishing exceptions to the hearsay rule under Federal Rules of Evidence 803 or 804[.]" *Id.* We concluded, however, that "it is not this court's privilege to 'question why'" and reviewed the district court's hearsay determination for an abuse of discretion. *Id.* at 717.

This court has not been so acquiescent in reviewing Rule 404(b) determinations. Some cases have continued to apply a three-part standard: clear error on whether other acts occurred, de novo on whether evidence was admitted for a proper 404(b) purpose, and an abuse of discretion on Rule 403 balancing. Others, relying on *Joiner*, have applied abuse of discretion to all three steps.[2]

---

[2] *See, e.g.*, *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (applying abuse of discretion standard to all three steps, noting tension in the case law but stating it was bound by the prior published case to the extent it conflicted with subsequent cases, citing *Trepel*); *United States v. Jenkins*, 345 F.3d 928, 936 (6th Cir. 2003) (applying abuse of discretion standard); *United States v. Ayoub*, 498 F.3d 532, 547 (6th Cir. 2007) (applying three-part standard); *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008) (applying three-part standard but noting disagreement in *Haywood*); *United States v. Allen*, 619 F.3d 518, 523 (6th Cir. 2010) (applying abuse of discretion standard).

Most recently, *United States v. Clay*, – F.3d –, 2012 WL 43592 (6th Cir. 2012), attempted to reconcile the three-part standard with *Joiner*, stating that reviewing a trial court's conclusions of law de novo "is consistent with the Supreme Court's admonition in *General Electric Co. v. Joiner* that we review evidentiary decisions for an abuse of discretion, because it is an abuse of discretion to make errors of law or clear errors of factual determination." *Clay*, 2012 WL 43592, at \*4 (citing *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005)). *Clay* explained that "*McDaniel* simply took over where *Trepel* left off by clarifying that the abuse of discretion review of evidentiary determinations which *Joiner* commands is not inconsistent with the court's abiding duty to review questions of law de novo." *Id.*

This conclusion, we believe, is technically inconsistent with *Trepel*, where this court acknowledged the seeming incongruity of applying a discretionary standard to a district court's legal determinations, yet applied the discretionary standard anyway in deference to *Joiner*. However, we agree with the general principle that "it is an abuse of discretion to make errors of law or clear errors of factual determination" and do not believe it foreclosed by *Trepel*.[3] *See, e.g.*, *United States v. Allen*, 619 F.3d 518, 523 (6th Cir. 2010) ("Generally, an abuse of discretion is evident when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its

---

[3]The *Trepel* court, in fact, seemed to apply the abuse of discretion standard in name only, finding that "the court erred—that is, abused its 'discretion'—by not allowing the experts to testify regarding the basis of their opinions." *Trepel*, 194 F.3d at 717. We also note that this Court has subsequently recognized, in the context of hearsay and other evidentiary determinations, that though "we review the district court's admission or exclusion of evidence under an abuse-of-discretion standard . . . [,] this Court reviews de novo the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Martinez*, 588 F.3d 301, 309 (6th Cir. 2009) (internal citations and alterations omitted).

discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.") (quoting *Ross v. Duggan*, 402 F.3d 575, 581 (6th Cir. 2004)); *United States v. Spikes*, 158 F.3d 913, 927 (6th Cir. 1998) ("A trial court abuses its discretion 'when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.'") (quoting *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985)).  Ultimately, the decision to admit or exclude 404(b) evidence is reviewed for an abuse of discretion.  But, like other discretionary judgments (such as the decision to issue or deny a preliminary injunction, *see Christian Schmidt Brewing Co.*, 753 F.2d at 1356, 1358), factual and legal issues may reside within the ultimate decision.  A discretionary judgment that rests on clearly erroneous facts or an improper application of the law or erroneous legal standard, then, is not a sound deployment of discretion but an abuse of it.  We review the district court's evidentiary ruling for an abuse of discretion, recognizing that such an abuse occurs where the ruling rests on clearly erroneous facts or an improper application of the law or erroneous legal standard. *See, e.g.*, *Spikes*, 158 F.3d at 927.

**B.  Sufficient Evidence that Other Acts Occurred**

Sandoval raises two issues regarding the sufficiency of the other acts evidence: (1) the district court erred in failing to explicitly find that the other act occurred and (2) even had the district court made an explicit finding, such finding would have been error because the alleged act was established on the testimony of a sole, uncorroborated witness who was not credible.  On his second point, Sandoval points out that Garcia was an informant for ICE, part of his testimony about how he became an ICE informant was contradicted by the testimony of ICE Agent Babcock, his claim that

not only Sandoval but another attorney advised him to lie on his immigration form was somewhat outrageous, and, in an interview with ICE agents about Sandoval's case, he failed to mention that he told Sandoval that he falsely represented himself as a citizen at the U.S. border, which was the critical piece of information necessary for Sandoval to have known that the information on Garcia's immigration form was false.

Regarding Sandoval's first point, this court does not require a district court to make an explicit finding that prior acts occurred. "[S]uch findings [that other acts occurred] need not be express, but rather, may be implicit by virtue of the fact that the court admitted the evidence." *United States v. Matthews*, 440 F.3d 818, 828 (6th Cir. 2006), *abrogated on other grounds by Joiner*, 522 U.S. at 141; *see also United States v. Wheeler*, 349 F. App'x 92, 96 (6th Cir. 2009) (finding district court's conclusion that prior act occurred was not error "[r]egardless of any purported lack of analysis").

On Sandoval's second point, this court has found that "the testimony of a single witness is sufficient for a reasonable jury to conclude that the defendant committed the prior acts, even where the witness is less than completely reliable." *United States v. Johnson*, No. 10-5290, 2012 WL 284300, at *4 (6th Cir. Jan. 31, 2012) (citing *Matthews*, 440 F.3d at 828–29). The fact that the testimony establishing a defendant's other acts is impeachable does not render the evidence irrelevant or insufficient, as long as "the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689 (1988). While the Supreme Court has cautioned that the Government may not introduce evidence of other acts based on "unsubstantiated innuendo," *id.*, here, the other acts were established by the testimony of a sworn

witness who claimed to be involved in the prior bad act. Further, the above-mentioned issues casting doubt on Garcia's credibility were drawn out on cross examination for the jury to consider. On this record, the district court did not abuse its discretion in implicitly determining there was sufficient evidence of Sandoval's alleged prior bad act.

## C. Admissible for a Legitimate Purpose

"Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *United States v. Bell*, 516 F.3d 432, 441–42 (6th Cir. 2008).

The district court did not specify the purpose for which it was admitting the evidence, but it cited to *United States v. Colon*, 880 F.2d 650 (2d Cir. 1989), as the basis for its ruling, which case discusses the admissibility of 404(b) evidence to show intent.[4] The court ultimately instructed the jury at the close of trial that it could consider the other acts only as it related to the defendant's intent or absence of mistake or accident, which are admissible purposes under Rule 404(b). We analyze in turn whether each purpose was in issue and whether the evidence was probative of such purpose.

### 1. Intent

Whether intent was in issue depends on the proofs and the defendant's theory at trial. *E.g.*, *United States v. Johnson*, 697 F.2d 735, 738-39 (6th Cir. 1983) ("[W]e have held that where intent

---

[4]*Colon* advised that where 404(b) evidence is offered to prove knowledge or intent, its introduction should be delayed until the close of the defendant's case when it is clear whether those issues are really in dispute. 880 F.2d at 660. This is why the district court here disallowed the 404(b) evidence in the Government's case in chief.

is a formal element of the government's case, but criminal intent can properly be inferred from the commission of the act itself, Rule 404(b)'s intent exception may not justify admission of the prior act evidence."); *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996) (finding that knowledge and absence of mistake were not in issue because the defendant never claimed he was unwittingly engaging in unlawful activity). Where the charged offense is a specific intent crime, however, "the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent notwithstanding any defense the defendant might raise." *Johnson*, 27 F.3d at 1192.

Sandoval was indicted for obstructing the due administration of justice in violation of 18 U.S.C. § 1503 and suborning perjury in violation of 18 U.S.C. § 1622. On the obstruction of justice count, Sandoval was charged under the third clause of the statute, known as the "omnibus clause," which provides, "Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b)." 18 U.S.C. § 1503. This court has interpreted the statute to include "a *mens rea* requirement that limits the scope to those who 'corruptly' or intentionally seek to obstruct justice." *United States v. Bashaw*, 982 F.2d 168, 170 (6th Cir. 1992) (citing *United States v. Jeter*, 775 F.2d 670, 675 (6th Cir. 1985)). "This requires that one impede the due administration of justice with 'the general intent of knowledge as well as the specific intent of purpose to obstruct.'" *Id.* (quoting *Jeter*, 775 F.2d at 679). Subornation of perjury requires that the suborner "know that the suborned person's statements are false and that [the perjurer] knows them to be false." 60A AM. JUR. 2d *Perjury* § 108 (West, Westlaw through 2011); *see also Riley v. United States*, 647 A.2d 1165, 1174–75 (D.C. Cir. 1994) ("It must be shown

that the suborner induced the witness to testify in a certain way and that the suborner knew or believed that such testimony would constitute a false oath.") (quoting 4 Charles E. Torcia, WHARTON'S CRIMINAL LAW, § 607, at 330 (14th ed. 1981 & Supp. 1993)).

The crime of obstructing justice involves the specific intent of purpose to obstruct, and Sandoval also put his general intent in issue by denying that he "corruptly" or intentionally sought to obstruct justice but rather spoke with Najera intending to bring the truth to light. Sandoval's state of mind was also in issue on the perjury charge, as his defense was that he acted under the belief that Perez was innocent and consequently did not know that asking Najera to tell the truth (as Sandoval understood it) would constitute perjury. It is clear that not only was intent in issue, it was the battleground of trial.

Sandoval does not dispute that intent was in issue but argues that the relevant intent was the intent to obstruct justice, not the intent to deceive, and Garcia's testimony was not probative of an intent to obstruct justice. He also argues that Garcia's testimony was not probative of his intent because there is no connection between his alleged prior act of advising a client to lie on an immigration form and at a subsequent interview and the current offense of asking a material witness to recant his former truthful testimony.

Neither contention is well taken. First, advising a client to lie under penalty of perjury on a form in connection with an immigration proceeding is certainly probative of an intent to obstruct justice. Where, as here, a defendant is charged with obstructing justice by endeavoring to procure falsehoods in a legal proceeding, the intent to deceive is subsumed in the intent to obstruct justice.

*See*, *e.g.*, *United States v. Ellison*, 336 F. App'x 483, 488 (6th Cir. 2009) (discussing willful intent to deceive and willful intent to obstruct justice interchangeably).

Second, we find Garcia's testimony probative of such intent. For other acts offered under Rule 404(b) to be probative of intent, they must be "substantially similar and reasonably near in time" to the intent offense at hand. *Haywood*, 280 F.3d at 721 (quoting *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)). "[T]he prior acts need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent." *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988). Advising a client to lie during immigration proceedings is, of course, not the same thing as attempting to get a material witness to recant truthful testimony in a criminal case, but they are similar in the relevant respect: intentionally injecting falsity into legal proceedings where truth is of paramount importance. This court has found 404(b) evidence admissible to show intent where the prior bad acts made it more probable that a defendant was acting dishonestly rather than honestly in the charged conduct. *See, e.g.*, *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 488 (6th Cir. 1999) (finding evidence that defendants previously ran a fraudulent business admissible to show that they intended to run their current operation as a pyramid scheme where defendants claimed they ran a legitimate business); *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998) (finding evidence that defendant defrauded customers through one telemarketing company was admissible to show he acted with intent to defraud at another where defendant claimed he was a legitimate salesman); *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 379 (6th Cir. 1997) (finding evidence that defendant

consistently failed to pay other lawyers was admissible to show he intended to defraud plaintiff lawyer in the instant case). Similarly, we find Garcia's testimony probative of intent here.

### 2. Absence of Mistake or Accident

Sandoval argues that absence of mistake was not in issue because his defense at trial was not that he had unknowingly or unwittingly asked Najera to lie but that he had never asked Najera to lie at all. This mischaracterizes the issue. Sandoval's defense was that he asked Najera to tell the truth as Sandoval honestly but mistakenly understood it, which, phrased in another way, is that he had unknowingly or unwittingly asked Najera to lie: a classic mistake defense. This court has consistently recognized that absence of mistake is in issue where a defendant admits involvement in a specific event but asserts that he acted unwittingly or with honest intent. *See*, *e.g.*, *McDonald v. Moorman*, 225 F.3d 660 (6th Cir. July 24, 2000) (per curiam) (unpublished table decision) (finding other acts evidence admissible to show absence of mistake where defendant admitted he had delivered a bag of cocaine but claimed he did not know what was inside the bag); *United States v. Stokes*, 392 F. App'x 362, 367 (6th Cir. 2010) (unpublished) (finding evidence of prior audit notifications admissible to show intent, knowledge, and absence of mistake where defendant charged with healthcare fraud asserted a defense of good faith mistake); *cf. United States v. Ward*, 190 F.3d 483, 489 (6th Cir. 1999) (finding absence of mistake was not in issue where the defendant's "defense was not that she mistakenly thought she was selling powdered sugar instead of cocaine").

Though we find that absence of mistake or accident was in issue, Garcia's testimony was not probative of those issues. In the cases cited above, the prior bad acts were relevant to show that the defendant could not have been mistaken about the nature of his charged conduct because the prior

occurrences put the defendant on notice that his charged conduct was criminal. In *Moorman*, the defendant was charged with aiding and abetting the distribution of cocaine, to which he asserted that he did not know the bag he delivered was filled with cocaine. This court found admissible evidence that the defendant had used cocaine before and had delivered cocaine for the same person on prior occasions because it tended to show that the defendant was not mistaken about the contents of the bag on the occasion at hand. *Moorman*, 225 F.3d at 660. In *Stokes*, the defendant, charged with health care fraud, asserted a defense of good faith mistake. This court found admissible evidence that the defendant had previously received audit notifications from insurance companies about his billing practices because it tended to show that the defendant's inaccurate billings were not a product of mistake but intentional fraud. *Stokes*, 392 F. App'x at 367. Here, however, the fact that Sandoval may have advised a client to lie in immigration proceedings in 2007 has no bearing on whether he knew Perez was involved in document fraud in 2009 and therefore knew he was acting corruptly when he asked Najera to vouch for Perez's innocence. Thus, Garcia's testimony was not probative of an absence of mistake in this case and erroneously admitted on this ground.

## D. Rule 403 Balancing

The last step in the 404(b) inquiry is to determine whether, under Rule 403, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Haywood*, 280 F.3d at 720. This Court affords a district court's Rule 403 balancing decision "broad discretion," looking at the evidence "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).

"One factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof." *Merriweather*, 78 F.3d at 1077; *see also Huddleston*, 485 U.S. at 688 (quoting Advisory Committee Notes on Rule 404(b) that urge the balancing decision be made "in view of the availability of other means of proof"); *Old Chief v. United States*, 519 U.S. 172, 182 (1997) (stating that courts should consider the "full evidentiary context" of the case when weighing probative value against potential prejudice). Another factor is the closeness in time of the other acts, "though this court has not adopted a bright-line rule concerning remoteness." *Matthews*, 440 F.3d at 830 (*citing United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir. 1985)); *see also Brown*, 147 F.3d at 483 (taking into account when the other act occurred in the balancing analysis). Also relevant is whether the district court gave a correct limiting instruction to the jury. *See, e.g.*, *United States v. Myers*, 123 F.3d 350, 363–64 (6th Cir. 1997).

Sandoval makes two arguments regarding the Rule 403 balancing question. First, he takes issue with the fact that the district court made no explicit finding that the proffered evidence was more probative than prejudicial. This argument is without merit, as "[t]his Court has stated that 'this balancing analysis may be subsumed in the court's ruling admitting the evidence.'" *United States v. Blankenship*, 954 F.2d 1224, 1229 (6th Cir. 1992) (quoting *United States v. Acosta-Cazares*, 878 F.2d 945, 950 (6th Cir. 1989)).

Second, Sandoval argues that the Government had other means to prove his intent to obstruct justice—namely, the fact that he lied to Judge Scoville about meeting with Najera. While the fact that Sandoval lied to Judge Scoville is certainly relevant, as it tends to demonstrate a guilty conscience and a lack of credibility, it is not strongly probative of the key issue in the case: whether

Sandoval endeavored to get a material witness to testify falsely, which turned on whether he knew that Perez was involved in document fraud as of February 22, 2009. This is not a case where, by virtue of the fact that Sandoval lied to Judge Scoville, it is immediately apparent that he acted with corrupt intent when speaking with Najera. *Cf. United States v. Jenkins*, 593 F.3d 480, 485–86 (6th Cir. 2010) (finding probative value of prior drug conviction was substantially outweighed by the risk of prejudice where knowledge and intent to distribute could be clearly inferred from the sheer quantity of drugs, cash, and weapons seized from a stash house). In fact, though the trial involved thirteen witnesses and spanned four and a half days, there was very little evidence that bore convincingly on that key issue. While Garcia's testimony was also not strongly probative of whether Sandoval knew Perez was guilty and thus acted with corrupt intent, it was probative of corrupt intent nonetheless and valuable considering the lack of other strong evidence at trial. This court has noted that 404(b) evidence is especially probative when it relates to deceitful intent, "which is not easily susceptible of proof." *Morganroth*, 123 F.3d at 379, *cited in Gold Unlimited*, 177 F.3d at 488.

In light of the relatively weak proofs at trial on the key issue of intent, the relative closeness in time of the alleged incident with Garcia (2 years prior to the charged offense), and the limiting instruction to the jury that correctly focused on the purpose of demonstrating intent,[5] the district court's implicit determination that the probative value was not substantially outweighed by the risk

---

[5]Though the district court's instruction to the jury contained the erroneous purpose of absence of mistake or accident, this court has previously declined to find such a flaw fatal to the validity of the overall instruction and the ultimate conviction in a similar instance. *See United States v. Myers*, 123 F.3d 350, 364 (6th Cir. 1997) (finding limiting instruction that included both a proper and improper purpose "adequately warned the jury of the potential misuses of the other-acts evidence").

of prejudice was not an abuse of discretion.  The evidence was admissible to show intent under Rule

404(b).

### III.  CONCLUSION

For the reasons above, we **AFFIRM** the judgment of the district court.